## WESTINGHOUSE ELECTRIC CORPORATION v. BULLDOG ELECTRIC PRODUCTS CO.

### No. 5925.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 14, 1949.

Decided Jan. 4, 1950.

Albert R. Connelly, New York City (James M. Guiher, Clarksburg, W. Va., Victor S. Beam, Thomas J. Byrne, New York City, Ralph H. Swingle, East Pittsburgh, Pa., and Cravath, Swaine & Moore, New York City, on the brief), for appellant.

Isadore Levin, Detroit, Mich. (Russell B. Goodwin, Wheeling, W. Va., Jacob L. Keidan and Butzel, Levin, Winston, Youngjohn & Quint, Detroit, Mich., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal in a patent infringment suit instituted by the Westinghouse Electric Corporation against the Bulldog Electric Products Company in the year 1943. A motion for summary judgment of dismissal was filed in 1944, on the ground that the patents were being used illegally in restraint of trade; but this motion was denied because the District Judge was of opinion that the question was ruled by the decision of the Supreme Court in United States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. After the decision of that Court in the cases of United States v. Line Material Company, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, and United States v. U. S. Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, the motion was renewed and was allowed in application of the clean hands doctrine on the authority of those cases. Westinghouse has appealed from the order of dismissal contending that the rules laid down in the cases last named are not applicable to the facts here involved and that, in any event, Westinghouse had purged it-

self of any illegality by action promptly taken upon the decision of the cases and a year in advance of the entry of the order of dismissal.

■ The motion for summary judgment was accompanied by a volume of documents setting forth sundry agreements relied upon by defendant; but the facts which counsel deemed material were incorporated in a stipulation of 95 paragraphs, which was the basis of the order entered by the court below. In their briefs in this court, counsel have quoted from the original documents in an apparent attempt to add to the stipulation. We are satisfied, however, that the stipulation fully and fairly presents the real points at issue and that nothing is gained for either side by going outside it, except in so far as the original documents may throw light on the facts as agreed. There would be no reason in having a stipulation of facts if parties were at liberty to ignore it; and, of course, if there is conflict between contentions of counsel as to the meaning of documents and the stipulation into which they have entered, the stipulation should control.

There are eight patents of Westinghouse involved in the infringment suit, all relating to electric circuit breakers. The contention that Westinghouse is precluded under the clean hands doctrine from maintaining the suit is based upon certain licensing contracts and agreements made in 1934 and 1936 with other manufacturers of electrical equipment, viz., the Square D Company, Cutler-Hammer, Inc., Colt's Patent Fire Arms Mfg. Co., The Arrow-Hart & Hegeman Co., Federal Electric Products Co., Inc., The Trumbull Electric Mfg. Co., and Frank Adam Electric Co.

The 1934 agreements did not involve cross licensing between patentees but merely the granting of licenses by Westinghouse to two other manufacturers, Square D and Cutler-Hammer, authorizing them to manufacture and sell under Westinghouse patents upon the payment of certain royalties and subject to a price maintenance provision. They covered a number of patents, listed in schedule A of the contract, relating to what the parties have called AB circuit breakers; and the licensees, in addition to agreeing to pay a 5% royalty, undertook that they would sell at prices no more favorable to customers than those followed by Westinghouse in making its sales. Westinghouse was to furnish a list of its prices to the licensees which might be changed upon not less than thirty days' notice. The licensees agreed not to assert against Westinghouse any patent claim that they might have or obtain on inventions "which are improvements upon and subservient to the inventions of any of the Westinghouse patents of the license".

Following the making of these contracts, Westinghouse developed certain circuit breaking devices known as "multi-breakers", involving patents not embraced in schedule A of the 1934 license agreements. Square D had applications pending in the patent office relating to devices of like character and an interference proceeding arose which was resolved by compromise. Westinghouse was conceded priority as to the patents; there was mutual licensing between Westinghouse and Square D as to multibreaker devices with provision for the payment of a 2½% royalty to the other on multibreakers which each might manufacture; and provision was made for a 60/40 division between Westinghouse and Square D of royalties collected from licensees of Westinghouse with whom Square D might execute agreements not to assert claims under its patents. In carrying out this agreement, the 1934 agreement between Westinghouse and Square D was amended on July 1, 1936, to add a new grant to manufacture multibreakers and a "new schedule C of patents covering the multibreakers which were not included in schedule A of the original agreement".[1] A new price maintenance clause was added which had relation to the multibreakers and not the AB breakers, the facts with regard to which are stipulated by the parties as follows: "12. A new price maintenance clause was added to Ar-

---

1. Paragraph 9 of stipulation of facts.

ticle VI of the agreement of July 1, 1934 (Paragraph 4 of this Statement) by this latter amendment of July 1, 1936 conditioning the new grant for multibreakers, covered only by patents of schedule C, on the licensee selling multibreakers at prices, terms and conditions of sale no more favorable to the customer than those followed by licensor in making its sales and so long as covered by the letters patent of schedule C. *The prices for multibreakers were set forth in a new schedule identified as schedule D forming a part of the amended agreement. The new price control clause for multibreakers did not include devices covered only by schedule A patents, which was for the AB breakers.*" (Italics supplied).

Square D executed a license agreement to Westinghouse on July 1, 1936 concerning which the parties have stipulated the following:

"16. On July 1, 1936, Westinghouse and Square D entered into an agreement by which Square D granted a non-exclusive, non-divisible license to Westinghouse, under the listed patents and applications of Square D, to make and sell the circuit breaker equipment known as multibreakers, with provision for royalty payment of 2½% by Westinghouse to Square D for all multibreakers made and sold by Westinghouse. The grant, Article III, paragraph (c) expressly excludes devices other than multibreaker, such as AB breakers.

"17. Article V entitled 'Non-Assertion' provides that if Square D agrees not to assert against a multibreaker licensee of Westinghouse on account of the manufacture and sale of multibreakers, certain existing and future Square D multibreaker patents or patent applications, then any royalty paid by that multibreaker licensee to Westinghouse for multibreakers, but not for AB breakers, shall be shared by Westinghouse with Square D in the proportions of 60% to be retained by Westinghouse and 40% to be paid by Westinghouse to Square D.

"17a. This agreement gives Westinghouse no right whatsoever to grant any rights, non-assertions or licenses under any patents of Square D, and gives Square D no right whatsoever to grant any rights, non-assertions or licenses under any patents of Westinghouse relating to circuit breaker equipment."

Pursuant to these agreements between Westinghouse and Square D, Westinghouse granted licenses to manufacture multibreaker devices to Cutler-Hammer, Trumbull, Colt, Arrow-Hart and Federal.[2] These licenses did not grant any rights with respect to AB circuit breakers. Each license provided for the payment of royalties to Westinghouse and was conditioned upon the licensee's prices, terms and conditions of sale being not more favorable to the customer than those established from time to time and followed by Westinghouse in making its sales. From time to time over the years Westinghouse published price schedules, known as schedules D, setting forth the Westinghouse prices for multibreakers, which, as provided for in the licenses, were followed by the licensees. Non-assertion agreements were entered into between Square D and the manufacturers mentioned.

The case of United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L. Ed. 701, was decided on March 8, 1948. A month later, on April 9, 1948, Westinghouse, evidently fearing that the price maintenance agreement with respect to multibreakers was violative of the law as laid down in that decision, wrote to Square D waiving the price maintenance agreement as to multibreakers, which were referred to as "latching contact bar type circuit breaker devices", in the following language:

"Multi-breaker licenses agreement.

"This letter is with reference to your license for latching contact bar type circuit breaker devices under the agreement made and entered into the first day of July, 1934, relating to circuit breakers, as modified by

2. The license from Westinghouse to Adam Electric Company did not embrace multibreakers or anything touching the agreement between Westinghouse and Square D.

an agreement made the first day of July, 1936, and as subsequently modified, between Westinghouse Electric Corporation, and your company.

"Westinghouse Electric Corporation hereby irrevocably waives the provisions of Article VI of said modified agreement for the full life of said modified agreement, insofar as such provisions are applicable to latching contact bar type circuit breaker devices, and hereby withdraws and cancels each and every schedule D submitted to you under said Article VI of said modified agreement."

Since Square D's license provided maintenance with respect to AB breakers as well as multibreakers, the waiver to Square D was limited to the latter. The letters of the same date to the other licensees was in precisely similar terms except that in the second paragraph it omitted the phrase "in so far as such provisions are applicable to latching contact bar type circuit breaker devices", thereby making the waiver as to the other licensees a general waiver of the multibreaker price maintenance provisions without reservation of any sort.

There is nothing in the record before us to indicate that the waiver made by Westinghouse of the price maintenance provisions of the multibreaker licenses was not made in good faith or that it has attempted to exercise any control over the prices of the licensees thereunder since the execution of the waiver. There is, likewise, nothing to indicate that any conspiracy in restraint of trade has existed with respect to multibreakers or any contractual or other limitation on prices which was not dissipated as a result of the waiver.

■ We think it clear that there is nothing in the price maintenance provisions of the contracts relating to the AB breakers that should deny Westinghouse the right to resort to the court to protect itself against the filching of its patents by an infringer. It is well settled by a long line of decisions that the grantee of a patent, in licensing the manufacture and sale of the patent by others, may impose as a condition that the licensees shall not undersell him, as this is reasonably necessary to his enjoyment of the monopoly granted him under the patent statutes. He may not, of course, by such licensing agreements extend the monopoly of the patent to unpatented commodities, Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 664-665, 64 S. Ct. 268, 88 L.Ed. 376; nor may he use it as a price fixing device in a conspiracy to restrain and monopolize trade and commerce beyond the scope of the monopoly granted by the patent statutes. See Bond Crown & Cork Co. v. Federal Trade Comm., 4 Cir., 176 F. 974, 978; United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. There is no reason, however, why he should be restricted to a price maintenance agreement with a single licensee, as argued by Bulldog, and the reasoning which permits licensing by grantees of patents and price maintenance provisions in maintenance contracts is clearly to the contrary. See Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058; United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819; General Talking Pictures Corp. v. Western Electric Corp., 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81; Interstate Circuit v. U. S., 306 U.S. 208, 228, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Univis Lens Co., 316 U.S. 241, 252, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L.Ed. 1461; and opinions of Mr. Justice Reed and Mr. Justice Burton in United States v. Line Material Co., supra, 333 U.S. at pages 305-312 and 343-353, 68 S.Ct. at pages 559-563 and 577-582. The rule is thus stated in the General Electric case, *supra*, by Chief Justice Taft, who had profound understanding of the commercial fabric of the country and its constitutional and statutory system as well as of the philosophy underlying the patent laws [272 U.S. 476, 47 S.Ct. 197]: "The patentee may make and grant a license to another to make and use the patented articles but withhold his right to sell them. The licensee in such a case acquires an in-

terest in the articles made. He owns the material of them and may use them. But if he sells them he infringes the right of the patentee, and may be held for damages and enjoined. If the patentee goes further and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself.' He does not thereby sell outright to the licensee the articles the latter may make and sell or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell."

█ The General Electric case was attacked in the Line Material case, but the Supreme Court did not overrule it and expressly declined to do so. We must accept it, therefore, as correctly stating the law; and, in the light of the law as there declared, there is no ground for holding Westinghouse precluded from maintaining an infringement suit because of the price maintenance provisions which it inserted in the licensing contracts relating to its AB breaker patents, as to which there was no combination with any other patentee.

With respect to the price maintenance provisions of the contracts licensing the making of the multibreakers, however, a different case is presented, and but for the waiver agreements of April 9, 1948, it might well be that these provisions would fall within the condemnation of the rule laid down in the Line Material case. These price maintenance provisions were used in contracts made pursuant to the agreement between Westinghouse and Square D by the terms of which there was a virtual pooling of the patents under which the multibreaker devices were manufactured. While there was no obligation upon Square D to grant non-assertion agreements to licensees of Westinghouse, the agreement for the splitting of royalties in such case made it to the interest of Square D to do so; and it is stipulated that in the case of all licenses except one such non-assertion agreements were executed. The situation, then, is that of two separate companies owning separate patents who expressly agree to eliminate all competition between themselves as to prices, terms and conditions of sale of the articles covered by those patents. This would seem to fall afoul of the rule laid down in the Line Material case, where it is said at 333 U.S. at page 311, 68 S.Ct. at page 562, 92 L.Ed. 701: "While the General Electric case holds that a patentee may, under certain conditions, lawfully control the price the licensee of his several patents may charge for the patented device, no case of this Court has construed the patent and antimonopoly statutes to permit separate owners of separate patents by cross-licenses or other arrangements to fix the prices to be charged by them and their licensees for their respective products. Where two or more patentees with competitive, non-infringing patents combine them and fix prices on all devices produced under any of the patents, competition is impeded to a greater degree than where a single patentee fixes prices for his licensees. The struggle for profit is less acute. Even when, as here, the devices are not commercially competitive because the subservient patent cannot be practiced without consent of the dominant, the statement holds good. The stimulus to seek competitive inventions is reduced by the mutually advantageous price fixing arrangement. * * * The merging of the benefits of price fixing under the patents restrains trade in violation of the Sherman Act [15 U.S.C.A. § 1 et seq.], in the same way as

would the fixing of prices between producers of nonpatentable goods."

The holding of the Line Material case, as we construe it, is summed up in the following language in the next to the last paragraph in the opinion of Mr. Justice Reed: "The mere fact that a patentee uses his patent as whole or part consideration in a contract by which he and another or other patentees in the same patent field arrange for the practice of any patent involved in such a way that royalties or other earnings or benefits from the patent or patents are shared among the patentees, parties to the agreement, subjects that contract to the prohibitions of the Sherman Act whenever the selling price, for things produced under a patent involved, is fixed by the contract or a license, authorized by the contract."

█ We need not decide, however, whether the price maintenance provisions of the multibreaker licenses are illegal, as we think it clear that any illegality that may have existed has been purged as a result of the action of Westinghouse in promptly surrendering all rights under these provisions following the decision in the Line Material case and abandoning all efforts at price control. It is argued that Westinghouse retains the right to control prices of multibreakers through the control retained over the prices which licensees of AB breakers may charge; but this is directly in the teeth of the stipulation of facts. It was with respect to the multibreaker devices, and these alone, that the agreements were made between Westinghouse and Square D; and these are claimed to be illegal solely because of the price fixing agreements attached thereto. When the price fixing feature is eliminated from these agreements as was done by the letters of April 9, 1948, nothing is left of which illegality may be predicated; since there is nothing illegal in splitting the royalties in consideration of the non-assertion agreements, when this is not accompanied by an agreement fixing prices. Even if patents of the AB breakers be involved in the construction of multibreakers, as argued, which seems to be contrary to the stipulation, there is no reason why the owner of the AB breaker patents may not control the prices of AB breakers so long as he does not attempt to control the price of the multibreakers.

█ We see no reason why, under the circumstances set forth, Westinghouse should not be held to have purged itself of unlawful conduct and to be entitled to the aid of a court of equity in the protection of its patent rights as against infringers. As was said by Judge Soper speaking for this court in Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947, 958, "While equity should withhold its assistance from the owner of a patent, who uses it to restrain competition in the sale of unpatented articles, by declining to entertain a suit for infringement, relief may be afforded when it clearly appears that the improper practice has been fully abandoned and the consequences of the misuse of the patent have been dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L. Ed. 367; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363".

Our decision in the case last cited was followed by the Sixth Circuit in Campbell et al. v. Mueller et al., 6 Cir., 159 F.2d 803, where a clause wherein a patentee had unlawfully sought to extend his monopoly had been cancelled pending the litigation. The court declined, in that case, to dismiss plaintiffs' suit and thus require them to seek relief in a suit instituted after the cancellation of the objectionable provision. And in Hartford-Empire v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, the Supreme Court, in breaking up a combination in restraint of trade, held that unlawful use did not authorize forfeiture of the patents thus involved and directed that the decree to be entered be without prejudice to the right to protect these patents by infringement suits against persons who after the entry of the decree should use the inventions without securing a license. Since plaintiff here has abandoned any illegal conduct, it is entitled to the protection of the courts and there is no reason why relief should not be afforded in the presently pending litigation.

■ It is argued that the unlawful conduct has not been abandoned because the letters sent out by Westinghouse constituted unilateral action on its part not joined in by its licensees; but no such joinder was necessary. The price maintenance provisions of the contract were for the protection and benefit of Westinghouse; and it is elementary that a party may waive a condition or stipulation made in his own favor. See Insurance Co. v. Norton, 96 U.S. 234, 24 L.Ed. 689. No one would contend that, if the price fixing provision were lawful, Westinghouse could have insisted upon compliance by the licensees after the sending out of the letter waiving it. Not only has it done everything that it could do to purge its licenses of the illegal provision, but there can be no question but that its action has had that effect.

■ It is further argued that, even if what was done removed the illegal provisions from the license contracts, it is not shown that the effect of the illegal conduct has been dissipated. If this were correct, it would result, not that the court should enter summary judgment for defendant but that it should hear evidence on the issue; for only where there is no issue to be resolved by evidence is summary judgment proper. We think, however, that the stipulation shows that the effects of the illegal provision have been sufficiently purged to enable Westinghouse to ask the courts to protect its rights. This is not a case such as Bond Crown & Cork Co. v. Federal Trade Comm., supra, or United States v. U. S. Gypsum Co., supra, where the price fixing in connection with patents is but one item in a widespread conspiracy to restrain trade and commerce, but one where the only illegality arises out of the price fixing agreement itself; and, when that is abandoned, the entire illegal element is removed.

Our conclusion, therefore, is that the District Court was in error in dismissing the case and that it should proceed to pass upon the issues and determine whether plaintiff is entitled to the relief prayed. We may add that we concur in what was said by the Court of Appeals of the Fifth Circuit in Paul E. Hawkinson Co. v. Dennis, 166 F.2d 61, 63, as to the inadvisability of granting summary judgment for a defendant charged with infringement of a patent on the ground of plaintiff's illegal conduct, unless it appears beyond question that relief should be denied on that ground. A party charged with infringement should not be permitted too easily to escape trial of the issue by raising a clamor to the effect that the holder of the patent alleged to have been infringed has done something that he should not have done. The public interest will be better served by a full hearing on all issues involved, before there is any attempt at dismissal in application of the clean hands doctrine, than by dismissal in advance of hearing on the motion of one who comes into court admitting for the purposes of his motion that he himself is guilty of infringement. As was well said by Judge Hutcheson in the case cited: "Since this is a patent suit and as such there is a public interest involved, instead of being tried and determined piecemeal, as was attempted here, it ought to be determined as a whole on the issues of patent validity, infringement and misuse. Tried and determined as a whole, the questions raised upon the issue of plaintiff's unjust and unfair uses and practices in respect of the patent could then be considered in the light of the realities as to whether plaintiff has a patent and whether defendant has infringed it, and not, as was done on this record, by a kind of shadow boxing in vacuo."

For the reasons stated the judgment appealed from will be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed.