**AIR PRODUCTS, Inc. v. BOSTON METALS CO.**

Civ. No. 5087.

United States District Court, D. Maryland.

May 25, 1951.

Benjamin C. Howard (Miles, Walsh, O'Brien & Morris), of Baltimore, Md. and James P. Burns and James J. Shanley, of Washington, D. C., for plaintiff.

Simon E. Sobeloff and Donald N. Rothman, of Baltimore, Md. and Clarence D. Kerr, Furman Rinehart and Rynn Berry, all of New York City, for defendant.

WILLIAM C. COLEMAN, Chief Judge.

This is an infringement suit involving a patent to Carl R. Anderson, No. 2,480,093, issued August 23, 1949, on application filed May 27, 1943, embracing a "method of and apparatus for pumping liquid oxygen."

Plaintiff, Air Products, Incorporated, is a Michigan corporation and owner of the Anderson patent. Defendant, Boston Metals Company, is a Maryland corporation and is charged with infringing claims 11, 13 and 19 of the patent. So, although the

patent embraces 20 claims, only these three, which are method claims, are involved in the present suit. Defendant asserts the two usual defenses, (1) non-infringement and (2) invalidity of the Anderson patent because anticipated by prior art patents; and in addition, claims that the Anderson patent has been used by plaintiff in violation of the patent and anti-trust laws, and that therefore no right may be asserted under the patent until proof, which is claimed to be lacking, that this misuse has been fully abandoned and that all its consequences have been dissipated.

In his patent, Anderson recites separately five objects of his invention. However, two of them, as stated in the patent, relate more directly to claims of the patent not here in suit, and two others, as stated in the patent, are merely more abbreviated enumerations of what is contained in the remaining stated object, and the three claims in suit, nos. 11, 13 and 19, are addressed to the accomplishment of that particular object which "is to provide a method and means for pumping liquefied oxygen directly from a pool of commercially pure oxygen in a fractionating tower to cylinders or pipe lines in which gaseous oxygen is transported under high pressure, thereby avoiding the requirement for an oxygen storage tank and a gaseous oxygen compressing system."

The first phase of the method and apparatus of the Anderson patent is admittedly old, namely, that of fractionating oxygen from the air (which consists mostly of nitrogen and oxygen nearly in the ratio of four volumes of nitrogen to one of oxygen), into substantially pure oxygen and slightly impure nitrogen by pumping oxygen in the liquid state through a fractionating column or columns where the stream is cooled below its boiling point by heat exchange against gaseous nitrogen from the top of the column or columns. This fractionating leaves two products,— gaseous nitrogen and liquid oxygen—each at a temperature slightly exceeding its atmospheric pressure boiling point—approximately 193° centigrade for nitrogen and 179° centigrade for oxygen. The next phase, namely, that of pumping the liquid oxygen at high pressure directly from the pool in the fractionating column, without the interposition of a storage vessel, vaporizing it and conducting it to the cylinders or pipe lines in which it is transported as a compressed gas, is claimed by Anderson to embody his invention in that, as Anderson claims, no method had theretofore been discovered which gives satisfactory results in pumping the liquid oxygen at the desired high pressure directly from the pool in the fractionating column without the interposition of a storage vessel.

As Anderson points out in his patent, the common practice is unduly costly of bringing the liquid oxygen to gaseous form and thereafter compressing it, instead of pumping it as a liquid and vaporizing it prior to its entrance into a pipe line or storage vessel, thereby saving an important amount of power. And yet, as Anderson points out, "The step of pumping liquid oxygen has proven in practice to be one of great difficulty. The liquid is, in the nature of the case, at its boiling point at the existing pressure. From this it follows that any reduction in pressure, such as is occasioned by fluid friction in the pump suction, or any increase in temperature due to leakage of heat into the pump body or to frictional heat, transmitted into the liquid, will cause the evolution of gas which locks the suction and puts the pump out of commission. A further cause of vapor lock is back leakage through the discharge valve, the high pressure leakage liquid partially flashing to the gaseous state." Anderson claims in his patent that he has overcome this problem of gas-locking of the pump "by two steps which are preferably used together but which may be used individually. The first is to utilize a small portion of the cooling effect available in the gaseous product nitrogen for cooling the stream of liquid oxygen, on its way to the pump, to a temperature below that corresponding to its boiling point at the pressure existing in the pump cylinder during the suction stroke. The second is to utilize another small portion of the refrigerating value of the nitrogen in cooling the pump cylinder."

There is no substantial difference between the three claims in suit, nos. 11, 13 and 19, although 19 is the broadest in that, unlike claims 11 and 13, it applies to mixtures of gases other than oxygen and nitrogen in the air. So parenthetically it may be pointed out that the title of the Anderson patent, i. e. "Method of and Apparatus for Pumping Liquid Oxygen" is somewhat mis-leading,—not broad enough. Claim 19 reads as follows: "The method of transferring liquefied product of a fractionating operation, in which operation a mixture of component gases having boiling points substantially below atmospheric temperature is compressed and cooled, the compressed and cooled mixture expanded and the effluent of the expansion step subjected to the fractionating operation to produce a liquefied higher boiling point fraction and a gaseous lower boiling point fraction, comprising withdrawing a stream of the liquefied higher boiling point fraction from the fractionating operation, subcooling the stream of liquefied higher boiling point fraction by heat exchange with a relatively colder product from the fractionating operation to reduce the temperature of the higher boiling point fraction to a point below the boiling point of the higher boiling point fraction at the minimum momentary pressure reached in an ensuing pumping step, pumping the subcooled higher boiling point fraction in liquid phase to a relatively high pressure and heat exchanging the higher boiling point fraction from the pump with the mixture of gases going to the fractionating operation to cool the mixture and vaporize the higher boiling point fraction."

*Infringement.*

The plaintiff's charge of infringement is based on the use by defendant in Baltimore of an oxygen producing plant which was manufactured by, and which it purchased from Superior Air Products Company, Newark, New Jersey, and installed in August, 1948, approximately one year before the Anderson patent issued. While Superior is not a party to the present suit, its counsel conducted the examination of witnesses and in general carried the burden of the defense.

This accused installation was manufactured by Superior according to the design of its president, Peter Peff, who testified that when he designed it as early as 1946 and proved it satisfactory for actual commercial production in 1947, he had no knowledge of what Anderson had done, and that he merely followed the teachings of prior art patents, primarily U. S. patents to Messer, No. 2,133,105, issued October 11, 1938, to Heylandt, Reissue No. 19,251 of July 24, 1934, and the German patent to Messer and Grassmann, No. 712,480, issued October 20, 1941. According to defendant's testimony, its accused plant, as originally designed by Superior, was to use a pressure pump of the type shown in Heylandt Reissue patent 19,251 (hereinafter considered under the question of validity of the Anderson patent), for pumping the liquid oxygen from the rectification column. However, while the accused plant was under construction, Superior learned of the Messer and Grassmann German Patent 712,480 (also hereinafter considered under the subject of validity) which indicated that a suction type pump might be used to advantage in the accused plant, its parts being more accessible for repair and replacement than the parts of the pressure type pump. As a result, Superior adopted a suction pump in the plant constructed for defendant.

A comparison of the very accurate detailed charts of the Anderson construction and method with those of the accused construction and method shows clearly that the two constructions and the two methods are in all material respects substantially identical, except that defendant does not directly cool the pump, as does Anderson, by passing the gaseous nitrogen through a coil around the pump cylinder, but does it by submerging the latter in a body of liquid oxygen which has previously been cooled by a heat exchange with gaseous nitrogen. We believe, nevertheless, that these two methods are to be treated as substantially equivalent and equally within the teaching of the Anderson patent. It is to be noted that Anderson states in his

patent specifications that the two exemplified cooling steps which he claims to be the gist of his invention may be used individually, although preferably together, i. e. (1) use of a small portion of the cooling effect available in the gaseous nitrogen for cooling the stream of liquid oxygen on its way to the pump; and (2) using *"another small portion of the refrigerating value of the nitrogen in cooling the pump cylinder."* (Emphasis supplied.)

Defendant takes the position that the claims in suit of the Anderson patent must be interpreted as requiring the particular method, as indicated in the specifications and drawings of Anderson, for direct cooling of the pump with nitrogen gas. However, when the language of the claims is read in connection with the language of the specifications which we have above quoted, we believe the reasonable interpretation is that Anderson recognized and therefore impliedly contemplated that the refrigerating value of nitrogen could, under his patent, be carried to the pump in a manner other than passing nitrogen gas through a coil around the pump cylinder. The defendant does in fact cool its pump cylinder by employing a portion of the refrigerating value of the nitrogen gas. The difference in the defendant's method is within this definition and is what is known in the art as an indirect exchange of temperature, as opposed to a direct exchange in Anderson. That is, in the defendant's method there is a jacket surrounding the pump the liquid oxygen in which has received its cooling from the colder nitrogen and passes this cold on to the pump. The method is similar to that employed in the ordinary ice-plant where the brine is first cooled by ammonia and then the brine is used to freeze the water by being circulated around it. On the other hand, the method employed by Anderson is a direct one, in that the nitrogen, after leaving the heat exchange, passes through a coil around the pump, thereby directly cooling it.

We are satisfied that there is no real difference between the Anderson patent installation and defendant's installation, and that therefore defendant infringes, unless the Anderson patent is invalid. Accord-ingly, to this question we now direct our attention.

### *Validity.*
### Prior Art Patents.

In support of its contention that the Anderson patent is invalid because anticipated by the prior art, defendant relies upon the following seven patents, the five American ones being given in the order of their issuance and the two German ones in the order of their issuance: to Von Recklinghausen, No. 1,394,955, issued October 25, 1921; to Heylandt, Reissue No. 19,251, issued July 24, 1934; to Eichelman, No. 1,976,388, issued October 9, 1934; to Messer, No. 2,133,105, issued October 11, 1938; to Hansen, No. 2,292,375, issued August 11, 1942; German patent to Polard, No. 495,795, issued April 12, 1930, and German patent to Messer and Grassmann, No. 712,480, issued October 20, 1941. All but the last named patent were before the Patent Office either directly in connection with the Anderson application or in interference proceedings in which Anderson was involved.

Defendant does not claim that the disclosure found in any one of these patents, standing by itself, completely anticipates Anderson, but that their combined disclosures give to anyone skilled in the art full knowledge of how to set up and operate the installation called for in the claims of the Anderson patent in suit, when read in the light of the Anderson specifications.

In order to determine whether this position of the defendant is correct, it is first necessary to understand specifically of what the Anderson invention consists, that is to say, the steps that are involved in the Anderson method. These steps are three in number as follows: (1) Withdrawing liquid oxygen from the boiling pool in the rectifier column and cooling it on its way to the liquid oxygen pump by heat exchange with the colder gaseous nitrogen withdrawn from the rectifier column; (2) pumping the liquid oxygen from the low pressure of the rectifier column to the high pressure desired in the shipping cylinders; and (3) converting this pumped liquid oxygen to gaseous form

in the air heat exchanger by heat interchange with the warm compressed air going to the rectifier column. Anderson does not call for any particular pressures to which the oxygen shall be pumped in the second step, the specifications and the three claims in suit merely providing that the liquid oxygen shall be pumped "to a desired higher pressure" (claims 11 and 13) or "to a relatively high pressure (claim 19). Similarly, the Anderson patent does not, either in the specifications or claims, treat as critical any specific temperature to which the liquid oxygen is to be cooled.

As we have pointed out earlier in this opinion, the first of these three steps in Anderson's method is what he denoted as the first phase and was admittedly well known in the art prior to the Anderson disclosure. But, as we have also pointed out, the basic problem with which Anderson claims in his patent he was faced and was the first to overcome, was the prevention of vapor-lock in the liquid oxygen pump; that is to say, the problem occurring in the second of the three steps in the Anderson method. We have also explained that Anderson claims to have been the first to solve this problem by two steps in the pumping operation, namely, (1) by sub-cooling the liquid oxygen on its way to the pump by utilization of a small portion of the cooling effect available in the gaseous nitrogen; and (2) by sub-cooling the pump cylinder itself through utilizing another small portion of the refrigerating value of the nitrogen by means of a coil around the pump cylinder.

Taking up the above seven patents in the chronological order given, the first is Von Recklinghausen, No. 1,394,955. This embraces an apparatus for pumping, by a reciprocating pump, liquid oxygen from the base of the air fractionating column, to a vaporizer in series with an interchanger. The air supply to the column passes first through the interchanger, then through a heating jacket surrounding the vaporizer and finally to the column. The liquid oxygen is vaporized in counterflow interchange with the partially cooled air supply; the vapor is brought up to atmospheric temperature under pumping pressure in

counterflow interchange with the warm air supply, and the warm gas is directed into pressure cylinders. Thus it will be seen that Von Recklinghausen does not disclose (1) cooling liquid oxygen from a rectifying column with a colder product of the column; (2) pumping oxygen that has been previously cooled by a product of the rectifying column; or (3) gasifying a high pressure liquid oxygen that has been previously cooled by heat exchange with a colder column product. Therefore, Von Recklinghausen does not anticipate Anderson. Furthermore, it is in effect a paper patent since although it issued to the Air Reduction Company, one of the larger producers of oxygen, its method and apparatus have never been used by that Company or anyone else, presumably because inoperative, since the lack of any cooling step applied to either the pump or the oxygen stream would result in gas-locking the pump.

Next Heylandt, Reissue 19,251, discloses a pressure pump in a tank connected with a pool of liquid oxygen which is pumped without sub-cooling and converted to gaseous form for delivery as highly compressed oxygen gas to high pressure containers. In other words, Heylandt relates specifically to apparatus and method for transporting liquid oxygen to the place where it is to be used and *there* converting it into a high pressure gas. Thus the entire Heylandt apparatus is designed for carriage of the liquid oxygen to points remote from the point of its production. Also, with Heylandt the liquid oxygen in the transport containers may reach pressure from 75 to 225 pounds which would be prohibitive in the rectifying column of Anderson.

Next is Eichelman, 1,976,388, which embraces an apparatus with the liquid oxygen pump submerged in a liquid oxygen tank which is placed below the liquid oxygen pool in the rectifier column, thus producing a hydrostatic head on the liquid oxygen in the pump tank. The liquid oxygen is pumped from the pump tank through the air heat exchanger where it is converted to gaseous form by heat interchange with the warm, compressed in-fed air and is

then delivered under high pressure to storage containers. Thus Eichelman does not disclose the method and apparatus of Anderson any more than does Von Recklinghausen. Eichelman does not in fact employ hydrostatic head pressure to obtain sub-cooling of the liquid oxygen; nor, assuming that this method was so used, is it to be treated as the equivalent of Anderson's method because, as testified by consulting engineer Lee S. Twomey, an expert witness for the plaintiff, whose testimony was outstanding for its clarity and comprehensiveness, such use would require some 32 feet of hydrostatic head to give an effect comparable to that obtained by about 8° of cooling, and if a pipe of such height be used the heat leak into it would go far to nullify the effect of the hydrostatic head, thereby requiring an extension of the pipe to even greater length and thus making such installation completely impractical in an integrated oxygen generating system such as that embraced in the Anderson patent. Eichelman, furthermore, is another paper patent in the sense that neither the Carbo Oxygen Company, to whom the patent was issued, nor any other company or individual has ever employed the method and apparatus of this patent.

Next we turn to Messer, 2,133,105, which discloses the pumping of the liquid oxygen, after leaving the rectifier column, through a heat exchanger where it is converted into gaseous form by heat interchange with the warm compressed air going to the rectifying column, and then is delivered under high pressure to storage containers. Thus it will be seen that Messer makes no disclosure of the sub-cooling method of Anderson any more than does Von Recklinghausen or Eichelman. Also, this is in effect a paper patent since it appears that although Superior Air Products Company acquired a free license under this patent from the Alien Property Custodian (the patentee, Messer, being an enemy alien) no use has ever been made of the Messer apparatus and method.

Turning next to Hansen, 2,292,375, it discloses the pumping of liquid oxygen and converting it into gas for delivery under high pressure to storage containers. The stream of liquid oxygen is withdrawn from a storage tank and expanded to a lower pressure in heat interchange with another stream of the same liquid oxygen passing to a pump. This system which is similar to that disclosed by Polard, 495,795, (which we will next consider) does sub-cool the stream passing to the pump, at least for a short time. But, whether or not capable of satisfactory commercial operation, it clearly is not in any sense a disclosure of Anderson's method of sub-cooling, since the cooling of the liquid oxygen is entirely divorced from a column operation, and the refrigeration latent in the gaseous nitrogen or in any other product of the column is not used. The Hansen method is wasteful of "power" which may not be prohibitive in pumping liquid oxygen from a storage tank but is prohibitive in the operation of pumping it from a fractionating column because of the consumption of "power" in excess of that normally required for the fractionating operation.

Coming next to the German patent to Polard 495,795, it discloses the pumping of liquid oxygen from a storage tank, the pump and its intake connection being submerged in boiling liquid nitrogen, the supply of which is maintained by withdrawing and recompressing the nitrogen vapor, cooling the compressed stream, and expanding it into the vessel in which the pump is located. Thus Polard in no sense discloses the cooling method of Anderson because the pumping and cooling of the liquid oxygen in Polard is no way connected with the column operation or caused by any column product. Like Hansen, it is a wasteful and therefore not a practical method for pumping liquid oxygen from a rectifying column, although it may be for doing so from a storage tank.

Lastly, we turn to the German patent to Messer and Grassmann, 712,480, which, although listed in the United States Patent Office library as early as June, 1946, nevertheless, was not among the references when Anderson's application was before the Patent Office. This patent discloses sub-cooling of liquid oxygen in a rectifier column by means of the gaseous nitrogen

product in the column, and claims that the liquid oxygen thus sub-cooled may advantageously be syphoned over into containers by means of a suction pump which, for reasons of construction, is usually more suitable than a pressure pump, as heretofore explained. Thus, Messer and Grassmann do, broadly speaking, disclose the first step of Anderson, namely, that of withdrawing liquid oxygen from a rectifier column and sub-cooling it in a heat exchanger by utilizing the colder nitrogen gas drawn from the top of the column. Also, broadly speaking, Messer and Grassmann disclose the second step of Anderson, namely, that of pumping liquid oxygen to a desired higher pressure. However, there is no disclosure in this German patent of either of the two steps taught by Anderson to avoid vapor-lock in pumping directly from the pool in the fractionating column without the interposition of a storage vessel. While there is sub-cooling disclosed by this patent, there is no disclosure of pumping liquid oxygen other than by reference to a patent of an undisclosed inventor who had used liquid nitrogen for cooling a pump and operating it to high pressure. The weight of the more credible testimony with respect to this Messer and Grassmann patent confirms, as the Court believes, witness Twomey's interpretation of it to the effect that the pump referred to being a suction pump, the purpose of it is to exhaust, by suction, the gas out of the receiving container, thereby syphoning the liquid oxygen from the storage container,—in other words a pumping process entirely different from the process employed by Anderson with respect to the liquid oxygen. It is significant that the drawing annexed to this patent does not disclose any pump whatsoever.

■ Having thus analyzed all of the seven prior art patents upon which defendant relies in support of its defense of anticipation of Anderson, it is apparent that none of these patents, considered individually, contains such disclosure as to constitute an anticipation of the whole Anderson combination. That is to say, no single one discloses all three steps of the Anderson patent, i. e. (1) withdrawing liquid oxygen from the rectifier column and sub-cooling it on its way to the liquid oxygen pump by heat exchange with the colder gaseous nitrogen from the column; (2) pumping the withdrawn liquid oxygen to higher pressure directly from the pool in the fractionating column without the interposition of a storage vessel, utilizing a small portion of the cooling effect of the gaseous nitrogen for cooling the stream of liquid oxygen on its way to the pump, or utilizing another small portion of the refrigerating value of the gaseous nitrogen in cooling the pump cylinder; and (3) converting the liquid oxygen thus pumped into gaseous form in the air heat exchanger by heat interchange with the warm compressed air going to the rectifier column.

Nor do these prior patents, considered together in any combination, anticipate Anderson because in all of them the oxygen, after its separation from the nitrogen in the fractionating column, enters the heat exchanger as a gas, whereas with Anderson, it enters as a liquid and is converted into gas in the heat exchanger. Also, in the prior art, the gaseous oxygen enters the heat exchanger at low pressure, whereas with Anderson, the liquid oxygen enters the exchanger at high pressure. Anderson pumps the liquid oxygen to the pressure ultimately desired in the cylinders in which it is to be shipped to the consumer; converts the liquid oxygen into gas and delivers it as such, completely dry, without the use of (1) a storage vessel (i. e. the common gas tank or bell water tank); (2) a compressor, or (3) a dryer, all three of which had been used in the prior art for some twenty-five years or more. Apart from the saving in the difference between the cost of these parts of the prior art apparatus, which with Anderson became no longer necessary, and the cost of the new parts which replaced them, it is conceded that there has been very material saving through the elimination of the costly maintenance of the parts of the apparatus just referred to and dispensed with by Anderson. Furthermore, the hazards of fire and explosion which have been not merely theoretical but actual and often very serious, in the eliminated compressor,

are completely avoided by Anderson and his entire apparatus is much more simple and composite, requiring very much less plant space than the prior art apparatus.

To summarize: we find nothing in the prior art which discloses what Anderson does in one unified combination, i. e. pumps, to a high pressure, liquid oxygen directly from a pool of boiling liquid oxygen and, in so doing, cools it by the nitrogen derived from the same separation from which the oxygen came; converts this high pressure liquid oxygen to gas by means of the heat in the compressed air feeding continuously into the same plant, and then puts it in cylinders ready for immediate consumption, i. e. the *entire* operation of producing the high pressure gaseous oxygen being integrated in *one producing* plant.

Defendant claims that Anderson has done nothing more than modify the first step in the combination of Eichelman by substituting another way for avoiding vaporlock of the pump, namely, by sub-cooling the liquid oxygen, and that such sub-cooling was known in the prior art as one way of avoiding vapor-locking when pumping liquid oxygen from a given source. In other words, defendant claims that even if Eichelman by itself does not disclose the precise step of sub-cooling the liquid oxygen on its way to the pump by utilizing the colder gaseous nitrogen in the specific manner used in the Anderson combination, it was nevertheless within the skill of those in the art, without the exercise of inventive genius, to substitute the Messer and Grassmann rectifier column with its built-in oxygen cooler as part of the Eichelman plant, when the Messer and Grassmann patent disclosure became available, as it did in 1941, prior to Anderson's invention, the application for which was not filed until 1943. In other words, defendant claims that Anderson's contribution, if any, that was new over the prior art was solely that of sub-cooling the pump itself with the gaseous nitrogen in the pumping operation; that, therefore, the inclusion of this step in the three claims in suit must be construed as alone saving them from anticipation; that if not so construed, the claims are invalid because anticipated; and that, if so construed, they are not infringed by defendant, because in its accused method this second step is not employed in the pumping operation.

What we have heretofore said is believed to be sufficient to indicate that this contention of defendant is not convincing. We must not lose sight of the fact that Anderson's invention lies in a method which embraces a combination of three steps which are not found in any prior patent, nor do we find that by piecing together two or more prior patents this threefold combination has been, in fact, disclosed or even suggested by anything in those patents which warrants saying that one skilled in the art, by piecing together what these prior patents teach could, without an inventive act, arrive at Anderson's method and accomplish what he accomplished. The act of invention consists in discovering how certain natural laws, as in this case, the laws of chemistry and physics,—may be applied for a beneficial purpose. "It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form." United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114. While the Supreme Court very recently in Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, has announced that the lower courts have been too prone to adopt a standard of invention in certain types of cases involving combinations of elements that is not sufficiently exacting, we believe that the conclusion which we here reach with respect to the Anderson patent is entirely consistent with that decision.

The fallacy of the contention that a finding of non-anticipation of Anderson requires a finding of non-infringement by the defendant lies in a failure to recognize the fact, as we have pointed out under the part of this opinion devoted to the question of infringement, that in order to infringe the second step in Anderson,—which is the only part of the Anderson method which the

defendant does not follow substantially in every material detail,—namely, the method of pumping the liquid oxygen from the low pressure of the rectifier column to the high pressure desired in the shipping cylinders, it is not necessary that the refrigerating value of the nitrogen be utilized, for the purpose of sub-cooling the liquid oxygen, *only* by means of a coil around the pump cylinder. There is sufficient latitude permitted in the pumping operation, as defined by Anderson in the claims here in suit and the specifications, to permit cooling of the pump as does the defendant, and still be within the teaching of Anderson, by submerging the pump cylinder in the body of liquid oxygen which has previously been cooled by heat exchange with gaseous nitrogen; in other words, to adopt an indirect instead of a direct heat exchange.

Much stress is laid by counsel for defendant upon the fact that the Messer and Grassmann patent was not among the patents considered by the Patent Office when the Anderson application was before it, including the interference proceedings (Rice v. Anderson, Interference 82574), which were abandoned by Rice, and it is argued that had the Patent Office considered it, a patent to Anderson would have been denied. Of course it is mere speculation as to what, if any, influence the knowledge of this German patent might have had upon the decision of the Patent Office Examiner. So it would be idle to indulge in such speculation. Suffice it to say that, for the reasons which we have fully given, we do not feel that knowledge of this German patent, if possessed by the Patent Office, should have prevented the issuance of the patent to Anderson. It is certainly very doubtful whether it discloses anything more than was disclosed by the Lachmann patent, 1,510,178, which was before the Patent Office as a reference in the Anderson interference proceedings. Lachmann used the nitrogen in the column to cool the oxygen in order to prevent evaporation on storage and on expansion to lower pressure. This fact, plus the indefiniteness of the terminology employed in this German patent and thus the incompleteness of its disclosure, does not permit treating it as an anticipation of Anderson.

There is no ground for saying that defendant's device was designed or put into any use or was on sale prior to Anderson so as to defeat his right to a patent within the provisions of R.S. Sec. 4886, 35 U.S. C.A. § 31. Anderson conceived his method as early as July 28, 1941; it was first reduced to practice August 14th of that year and his patent application was filed May 27, 1943; whereas the earliest design of defendant's accused method was in 1946 and it was not put into commercial production until the following year. Thus, even if it be a fact, as claimed by defendant, that its accused structure was developed by Superior entirely from the prior art, this does not defeat Anderson's status as the first inventor of the combination embodied in the accused structure because (1) this combination is not anticipated by the prior art patents, either individually or collectively; and (2) invention of the combination by Anderson antedated any invention by Superior.

In an effort to show that erroneous assumptions were made by both Anderson and the Patent Office Examiner as the basis for Anderson's claim to patentability of his combination, defendant introduced a large amount of testimony indicating successful operation of plants in Spokane and elsewhere *without sub-cooling.* However, since the basic issue in the present case is not whether the prior art disclosed methods for pumping liquid oxygen *without sub-cooling,* but whether it taught the equivalent of Anderson's method of pumping it *with sub-cooling,* testimony of this character is distinctly collateral and therefore it is unnecessary to analyze it.

Insofar as the specifications and the three claims of the Anderson patent in suit are concerned, we find that they embrace a clear, complete and adequate disclosure to those skilled in the oxygen producing art, of the combination of the steps involved in the Anderson method. We further find that there was no impropriety or irregularity in the manner in

which the Anderson patent was prosecuted in the Patent Office and that there were no improper admissions or representations there made on behalf of Anderson in order to induce the issuance of the patent to him.

■ While commercial success, generally speaking, becomes an important factor only where the question of invention is in doubt,—which is not true in the present case,—nevertheless, the commercial success which has attended the Anderson method should not be here ignored. The plaintiff has manufactured and sold over $12,000,000 worth of oxygen producing plants employing the Anderson method, this equipment having been extensively sold to the United States Government, to industrial concerns both throughout the United States and abroad, and it has been preferred by the Thomas A. Edison Company over the oxygen producing installations embodying prior art practices upon the recommendation of leading consulting engineering firms. This is strong evidence that Anderson successfully solved a problem that had existed in the oxygen producing art for twenty years prior to his invention.

### Alleged Patent Misuse.

■ The plaintiff both sells and leases equipment for the generation of oxygen in accordance with the Anderson method. Plaintiff's standard lease agreements at the time the present suit was instituted contained the following requirement: "Lessee agrees that during the life of this agreement it will obtain from the operation of lessor's equipment, and use said equipment to supply, its entire requirements of oxygen and nitrogen from and after [the date of lease] in the manufacturing operations of lessee at [lessee's address]." In short, obtaining a license for a period varying from three to five years, automatically renewable in most cases for a like period under the Anderson patent, was conditioned upon the use of the Anderson installation exclusively, and upon obtaining oxygen and nitrogen requirements exclusively from plaintiff. Defendant claims that this use of the Anderson patent to suppress the

manufacture and sale of competing goods not covered by the patent has affected a substantial part of interstate business in both patented and unpatented oxygen plants, and in oxygen and nitrogen in violation of the patent and anti-trust laws in that the restraints of such requirements embrace both (1) a misuse of the patent, and (2) a violation of the anti-trust laws. United Shoe Machinery Co. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708. However, plaintiff, just prior to the trial of the present suit, modified all of its outstanding lease agreements, eliminating therefrom the above quoted restrictive clause with the concurrence of all but two of plaintiff's lessees, and they, likewise, concurred before the trial was concluded. Nevertheless, defendant contends that there has been no adequate proof that plaintiff's leases and licenses have been or will be renewed to those lessees who do not continue to obtain their requirements wholly from plants leased from plaintiff; that plaintiff's market position is still the same as it was before the change in its standard agreement, and that, therefore, there has been no adequate showing that the consequences of the misuse of the Anderson patent have been dissipated, relying upon International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 and Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. But we feel that in this respect defendant's counsel are straining the law and that any illegality on the part of the plaintiff has been adequately purged. See Automatic Radio Mfg. Co., Inc. v. Hazeltine Research Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312; Westinghouse Elec. Corp. v. Bull Dog Electric Products Co., 4 Cir., 179 F.2d 139.

### Conclusions.

Summarizing our conclusions, they are as follows: (1) method claims 11, 13 and 19 of the Anderson patent No. 2,480,093, are valid; (2) the method of pumping liquid

oxygen employed by the defendant infringes these claims; and (3) the plaintiff has seasonably and adequately purged itself of any violation, and has removed the effects of any violation of the patent or anti-trust laws which it may have committed.