SAMUEL J. MILLER & CO., a partnership composed of Samuel J. Miller, Henry J. Miller and Nathaniel Miller, for itself and, as to Count Three, also on Behalf of United States of America

v.

A. SCHRETER & SONS COMPANY, Incorporated, a Maryland Corporation, Sidney H. Schreter, Leon M. Schreter, A. Harvey Schreter and Sidney H. Schreter and Daniel C. Joseph, as surviving Executors of the Estate of Abraham Schreter.

Civ. No. 13999.

United States District Court
D. Maryland.

Oct. 19, 1965.

John W. Avirett, 2d, John Martin Jones, Jr., Robert B. Barnhouse, and Piper & Marbury, Baltimore, Md., and Walter J. Blenko, Jr., Pittsburgh, Pa., for plaintiff.

Edward Pierson, Leon H. A. Pierson and Pierson & Pierson, Baltimore, Md., and William D. Denson and Morgan, Finnegan, Durham & Pine, New York City, for defendants.

THOMSEN, Chief Judge.

Now before the Court is plaintiff's motion for a partial summary judgment declaring invalid defendants' U. S. Patent No. 2,813,273 for a "button-down necktie".

Patent '273 was issued on November 19, 1957, to the late Abraham Schreter, the father of the individual defendants [1], pursuant to an application filed by him on November 28, 1955. The corporate defendant (Schreter, Inc.) manufactures and sells neckties made in accordance with the teaching of that patent. Plaintiff, a competitor, also manufactures and sells button-down neckties.

The complaint contains three counts: (1) for treble damages and injunctive relief under the antitrust laws; (2) for a declaratory judgment that Patent '273 is invalid and for other relief; and (3) for assessment of the statutory penalty for unlawful patent marking. Defendants' counterclaims assert (A) infringement of Patent '273 by plaintiff, and (B) unfair competition by plaintiff through

---

1. The executors of Abraham Schreter are also parties defendant.

improper representations to the public of the scope and effect of Patent '273.

Plaintiff's motion for partial summary judgment is limited to the question of the validity of Patent '273. Plaintiff contends that the patent is invalid on two grounds: (1) that it was anticipated by the prior art and was unpatentable over existing patents; and (2) that the alleged invention described and claimed in Patent '273 was in public use and on sale in the United States by Schreter, Inc. and others more than one year before November 28, 1955, the date of the application for that patent, and was described in printed publications in the United States more than one year before that date.[2]

There is no dispute about any material fact. The only disputes shown by defendants' markings of plaintiff's statement of facts[3] deal (a) with details not essential to the decision of the pending motion or (b) with plaintiff's use of the term "button-down neckties" to describe certain ties which were manufactured and sold by Schreter, Inc. and others more than a year before the application for Patent '273 was filed, as well as the ties now being manufactured and sold by Schreter, Inc. However, Patent '273 itself shows that the term "button-down neckties" had been applied to some neckties manufactured and sold before the application for that patent was filed; e. g., Patent '273 recites in column 1 certain "deficiencies" in "button-down neckties of the prior art" and "in prior types of button-down neckties". Moreover, various advertisements published by Schreter, Inc. more than a year before November 28, 1955, show that some ties manufactured and sold by it before November 28, 1954, were referred to as "button-down neckties".

At all material times from 1953 to date, Schreter, Inc. has been manufacturing and selling neckties under the tradenames "Smoothie" and "Prince Consort".

As a result of a suggestion by a friend that he manufacture a tie that would not flap in the wind, Abraham Schreter, assisted by his wife, placed three buttonholes in a conventional necktie one evening at home late in 1953. Shortly thereafter, Schreter, Inc. began production of button-down neckties having three buttonholes and a loop label.

It is conceded that neckties having a loop label on the back of the wide (top) end to "removably receive" the narrow end had been made and sold for many years; and patents had been issued for neckties with buttonholes in or attached to the narrow end of the tie, so that it could be buttoned onto the shirt. See, e. g., Ratajack U. S. Patent 1,798,432, issued March 31, 1963, and Glazier U. K. Patent 359,097, dated October 22, 1930. The latter patent embodied both the loop and the buttonholes. See also the discussion in column 1 of Patent '273 itself.

Nevertheless, on February 9, 1954, Abraham Schreter filed a patent application, Serial No. 409,095, directed broadly to a button-down necktie, but that application was later abandoned.

On February 12, 1954, Hochschild, Kohn & Co., a Baltimore department store, advertised the "New Smoothie Button-Down Tie" in the Baltimore Sun. The tie shown in the Hochschild, Kohn advertisement had a loop and three buttonholes, similarly placed to those later shown in Patent '273.

On February 17, 1954, Hochschild, Kohn wrote to Schreter, Inc., stating that it had sold some 38 dozen button-down neckties following publication of the February 12 advertisement.

2. 35 U.S.C.A. § 102(b) provides:
  "§ 102. Conditions for patentability; novelty and loss of right to patent
    "A person shall be entitled to a patent unless—
    "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

3. See footnote 80, page 61, "Handbook of Recommended Procedures for the Trial of Protracted Cases," adopted by the Judicial Conference of the United States, March 1960.

On March 2, 1954, a full-page Schreter, Inc. advertisement in the Daily News Record, a trade publication, reproduced the Hochschild, Kohn letter of February 17, 1954, and listed more than three dozen stores throughout the United States which had already ordered button-down neckties from Schreter. The tie illustrated in the Daily News Record advertisement was similar to the tie later described in Patent '273. The description of the tie in the advertisement will be set out in the discussion below.

On April 9, 1954, Schreter, Inc., in a Daily News Record advertisement sought salesmen through the midwest to sell "our sensational patented 'BUTTON-DOWN' TIE", which had by then been "ordered and reordered" by stores "from coast to coast".

A Prince Consort button-down tie, manufactured by Schreter, Inc. was pictured in an advertisement by K. Katz & Sons in the Baltimore Evening Sun on June 17, 1954, and described in the following manner: "Short end of tie is equipped with 3 button holes * * * so spaced that when tie is tied, one button hole matches position of button on shirt. Hidden loop keeps big end of tie in place."

On July 8, 1954, a Schreter, Inc. advertisement to the trade pictured its "button-down neckties" and stated that those ties had been sold by more than 2200 different stores in the United States.

All of the foregoing items were published more than a year before the filing, on November 28, 1955, of the application which resulted in the granting of Patent '273.

Button-down neckties similar to the tie described in Patent '273 were attached to the depositions of several witnesses who testified that they purchased the ties before November 28, 1954. Defendants deny that the ties attached to the depositions were actually made by Schreter, Inc. Whether they were made by it or by someone else is immaterial if such ties were in fact being sold to the public more than a year before November 28, 1955. It is not disputed that some at least of the ties attached to the depositions were sold before November 28, 1954; indeed there was correspondence about some of them before that date.

Patent '273, after reciting the "deficiencies" of "prior types of button-down neckties", states:

"A specific object of the invention is the provision of a button-down necktie of the type mentioned which requires only a minimum number of button holes, namely, three, and which is, therefore, relatively simple and inexpensive to manufacture.

"Another object of the invention is the provision of a necktie of the type mentioned in which the button holes are oriented and arranged in relation to each other and in relation to the buttons of a man's ordinary or conventional shirt, so as to insure the fact that one of the button holes under any condition can be brought into registry with one of the shirt buttons within the limits of stretch of the small end portion of the necktie."

Claim 1 reads as follows:

"A button-down four-in-hand necktie comprising a plurality of fabric layers including a front layer and back layer, a lining disposed between said front and back layers, said necktie having a narrow portion at one end and a wide portion at the other end, the front and back layers having overlapping portions stitched to said lining, said wide portion having a single horizontal loop forming member on the back thereof to removably receive the narrow end portion, said narrow end portion having a group of three equally spaced vertical buttonholes therein, extending through the said overlapping portions, and the lining, said group beginning above the end of said narrow portion a distance less than the vertical space occupied

by said group, but greater than the distance between two adjacent buttonholes, said group terminating a substantial distance below the bottom edge of the loop when the necktie is conventionally knotted and worn with the two ends thereof substantially together, the vertical space occupied by said group of buttonholes being substantially equal to that between consecutive buttons on a man's conventional dress shirt, said group of three buttonholes being the least number thereof capable of engaging one of said buttons with no more than normal stretch of said small end of the necktie when knotted." [3]

No definite number or location of buttonholes had been specified in the prior art patents, and no doubt Patent '273, which does specify the number (three) and the location of the buttonholes, was issued because of that fact. However, it does not appear that the persons responsible for issuing Patent '273 were aware that ties which complied with the teaching of Patent '273 with respect to the number and location of the buttonholes had been depicted in advertisements and had been manufactured and sold by Schreter, Inc. more than a year before the application for Patent '273 was filed. Defendants seek to draw a distinction between the "generally undesirable" and unsatisfactory button-down ties made before November 28, 1954, "which had not found much favor in the commercial market," and the ties made pursuant to the teachings of Patent '273 thereafter. But Schreter's own advertisements belie its present contention that the button-down ties which it made and sold before November 28, 1954, were not satisfactory. The advertisements repeatedly contain statements like the one in the Daily News Record of March 2, 1954: "The Smoothie 'Button Down' Tie is the greatest spontaneous success story that ever hit the neckwear industry. It's a practical, sensible construction idea

that's sweeping the country." Other advertisements published by Schreter, Inc. before November 28, 1954, stated that its button-down ties had been sold by 2200 stores and had been "ordered and reordered" by stores "from coast to coast".

The text of the advertisements as well as the neckties depicted therein show that the early 1954 ties were made in accordance with the teachings of Patent '273. Reference has already been made to the statement in the Katz advertisement of June 17, 1954. The full-page advertisement inserted by Schreter, Inc. in the Daily News Record had been equally specific, stating: "The short end of the tie is constructed with 3 buttonholes—spaced so that when tie is tied—one of the button-holes will match position of button on shirt. When small end of tie is slipped through loop label sewn on back of big end of tie—then buttoned to shirt—it keeps tie in place—keeps shirt down—keeps shirt collar in position. Only necessary to button-down on one button. Satisfaction guaranteed."

That quotation, which is virtually repeated in other advertisements in early 1954, describes simply and popularly what is claimed in Patent '273.

■ This Court would not grant a summary judgment declaring Patent '273 invalid based upon the prior art patents alone, even though it might reasonably be held after a trial that it would have been obvious to anyone skilled in the art that the fewer the buttonholes the lower the cost, that no less than three buttonholes of appropriate size could work satisfactorily, and that they should be placed substantially as they are placed in Patent '273. But whether those facts would have been obvious to anyone skilled in the art before he saw the advertisements which Schreter, Inc. published and the neckties which it made early in 1954, they were fully disclosed by the text and the illustrations in the advertisements published early in that year;

---

3. Claim 2 adds nothing material to the issues in this case.

and the invention claimed in Patent '273 was embodied in the ties which Schreter, Inc. made and sold before November 28, 1954.

■ The Courts are properly reluctant to grant motions for summary judgment in patent cases where the particular patent uses terms of art which must be translated into lay language, or the prior art patents and publications require expert testimony to explain them to the Court. That is not the situation here. The terms used in the patents and publications are popular and non-technical, and the principles involved are simple. There is no dispute as to any material fact or inference, and the Court is satisfied beyond any reasonable doubt that the claimed invention was used in the manufacture of neckties sold by Schreter, Inc. in the United States before November 28, 1954, and described in advertisements which defendants caused to be published before November 28, 1954.

"Where there is no genuine issue as to any material fact, it is the duty of the Court to grant a motion for summary judgment in order to save the time and expense which would be required for the preparation and trial of the issues covered by the motion." Bond Distributing Co. v. Carling Brewing Company, D.Md., 32 F.R.D. 409, 415 (1963), aff'd 4 Cir., 325 F.2d 158 (1963).

■ Defendants argue that the requested partial summary judgment should not be granted because it would not dispose of the whole case and would prejudice a jury's consideration of the other points. The partial summary judgment will, however, dispose of the principal issue in the case. The remaining claims and counterclaims are more easily alleged than proved, and the Court may reasonably hope that they will be settled without the time and expense of a trial, which could not be held for a long time in the future. It is desirable that the parties know where they stand on the principal issue, so that they may guide their future conduct accordingly.

Bond Distributing Co. v. Carling Brewing Company, supra. This is not a case like Westinghouse Electric Corporation v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139, 146 (1950), where the summary judgment dealt with the alleged unjust and unfair uses and practices with respect to the patent, before its validity had been determined. The question of validity is basic. Its decision at this time will not prejudice the jury's consideration of the other points, which turn on different though related questions. If the motion were not granted at this time and the case went to trial, the Court would rule as a matter of law that on the undisputed facts Patent '278 is invalid. The jury would know that ruling before considering the other related questions.

The motion for partial summary judgment will be granted. Counsel will prepare an appropriate order.