KORATRON COMPANY, INC., a corporation, Plaintiff,

v.

LION UNIFORM, INC., a corporation, Defendant.

No. C–70–1252–CBR.

United States District Court, N. D. California.

March 12, 1976.

Moses Lasky, Brobeck, Phleger & Harrison, San Francisco, Cal., James W. Geriak, Lyon & Lyon, Los Angeles, Cal., for plaintiff.

M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Lawrence B. Biebel, Biebel, French & Bugg, Dayton, Ohio, for defendant.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This suit for patent infringement was brought by plaintiff Koratron Company, Inc. (Koratron), against defendant Lion Uniform, Inc. (Lion). Lion raised a number of defenses, including the invalidity, limited scope, and misuse of the Koratron patent. This case is now in the second stage in a bifurcated proceeding involving exceedingly complex patent and antitrust questions.

Seventeen actions were consolidated for pretrial proceedings by order of the Judicial Panel on Multidistrict Litigation. Sixteen of the actions, including the instant case, were subsequently consolidated for trial. The trial was bifurcated in the interest of judicial efficiency. Following an extensive trial, the Court issued a Memorandum of Opinion, reported as *Jack Winter, Inc. v. Koratron Company, Inc.*, 375 F.Supp. 1 (N.D. Cal.1974), which resolved many, but not all, of the central issues in the sixteen actions. From the beginning, it was contemplated that a subsequent trial, such as the present proceeding, would be necessary to resolve the remaining issues. The scope of this proceeding is, however, much narrower than was expected because Koratron has successfully negotiated settlements with all of the original litigants with the exception of Lion.[1]

The complexity of the factual and legal issues before the Court in the first trial necessitated an unusually long opinion. Because of the length and detail of that opinion, a summary review will suffice here. The issues in the first trial revolved around the so-called '432 patent (U.S.Patent No. 2,974,432), a patent held by Koratron which teaches a process for the manufacture of permanent press garments. The Court sustained the validity of the '432 patent, although it restricted the scope claimed for it by Koratron. Although the Court's findings regarding the issues of validity and scope have defined the parameters of the present action, they are not directly involved in the issues now before the Court. More pertinent to the present action are the findings that actions taken by Koratron to strengthen the market power of the '432 patent constituted violations of Section 1 and Section 2 of the Sherman Act and patent misuse.

Two issues are before the Court in this action. The first is whether the patent misuse found by the Court in the first opinion has been abated and its effects in the market dissipated so that Koratron can again enforce its rights under the '432 patent as defined by the Court.[2] The second is whether Lion is entitled to recover attorneys' fees and expenses in a stipulated amount for its assertion of the

---

1. Pursuant to a Stipulation for Submission of the Case ("Stipulation") filed July 15, 1975, the Court approved submission of the remaining issues to be tried upon the basis of the following evidence:

a. All facts admitted in the Pretrial Order of March 20, 1972, in the consolidated cases, plus all evidence heretofore introduced during the partial trial of the consolidated cases; and

b. The facts agreed to in the Stipulation. The Stipulation is appended as Appendix 1 to this Memorandum of Opinion. The exhibits attached to the Stipulation as it was filed have not been included because of their bulk.

2. One issue which was anticipated but which was not raised by Koratron was the possible justification of the tying arrangements, which are discussed below, under the doctrine of *United States v. Jerrold Electronics Corporation*, 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

misuse defense and its antitrust counterclaim against Koratron.

## I. PATENT MISUSE

■ The basic statement of the patent misuse doctrine with supporting case citation was set out in the first opinion and need not be repeated here. Suffice it to say that when the Court decides whether misused patent rights can again be enforced, either by way of an action for infringement or by way of an action for unpaid royalties, it sits in equity and is vested with considerable discretion in evaluating the actions of the patentee.

Evaluation of the misuse defense relied upon by Lion must begin with an examination of the Court's finding in the first opinion regarding misuse:

> " * * * [T]he Court finds that Koratron has misused its patent in that it violated § 1 of the Sherman Act by tying the use of unpatented Koratron-trademarked products to the granting of a license to utilize the '432 patent [footnote omitted] and also by tying the rights under '432 to the use of Koratron's trademark [footnote omitted]. *Morton Salt Co. v. Suppiger Co.,* 314 U.S. 488, 491–494, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Second, these tying arrangements, as well as the Dan River agreement and Swede consent decree, have been held to constitute an attempt to monopolize in violation of § 2 of the Sherman Act. As such, they also constitute patent misuse [footnote omitted]." 375 F.Supp. at 71–72.

The parties are in apparent agreement that Lion's misuse defense now rests on only two of the misuses described above. The first is the misuse of tying the right to practice the '432 patent to the agreement by garment maker licensees to affix a Koratron trademark to all garments made under the license. The second is the misuse of entering into the Dan River agreement and the Swede consent decree with the intention to monopolize "the manufacture, processing and sale of resin-impregnated fabrics, related textile materials, and durable press

garments." *Id.* at 68. These misuses and the action or inaction on the part of Koratron to dissipate their effects will be discussed in more detail below.

### A. *The Trademark Tie*

■ Because of the nature of the process taught by the '432 patent, it was necessary for Koratron to license both textile mills and garment makers. In the first opinion, the Court described the complex web of tying agreements that Koratron imposed on those licensees as a condition of granting licenses under its patent. The most significant of these for present purposes was the requirement that garment maker licensees agree to affix the Koratron trademark to all garments made by them under the license. The Court found that this trademark tie constituted a *per se* violation of Section 1 of the Sherman Act and a misuse of the '432 patent. *Id.* at 65, 72. The issues now before the Court are when, if at all, this misuse ceased and when, if at all, its effects were dissipated. On these issues the parties are sharply divided.

The history of this trademark tie provision of the garment maker's patent license is not seriously disputed, but the legal conclusions regarding the misuse doctrine to be drawn from that history have been one of the most bitterly contested issues in the present action. The license form with the trademark tie was used by Koratron from 1963 until December of 1967 when it was eliminated from a new and substantially revised license form adopted at that time. Subsequently, the new form was used for all new licensees. Also, in December of 1967, Koratron offered existing licensees the opportunity to change from the old form to the new one and thus to escape from the trademark tie. A number of the then-existing licensees, however, declined to change, and, therefore, remained under the old form with the trademark tie. Furthermore, the old-form licenses included an option to extend the term for an additional period of five years, and several of the licensees

who had acquired their licenses before December of 1967 exercised that option. The last of the old-form licenses which included the trademark tie finally expired on June 25, 1975, the extension option having been exercised by the licensee on June 25, 1970.

Based upon these facts, the Court holds that the patent misuse in the form of the trademark tie did not stop before June 25, 1975, when the last of the old-form licenses containing the trademark provision finally expired. This is not a simplistic conclusion drawn from the fact that one such license was outstanding. Koratron's reliance on the facts that relatively few of such licenses were outstanding and that limited royalties were paid under them simply misconceives the burden placed on Koratron by the finding of patent misuse. In the first opinion, the Court held that Koratron would be precluded from enforcing its patent "[u]ntil Koratron demonstrates to the satisfaction of this Court that these practices or similar ones are no longer followed and that their effects in the market have been dissipated * * *." 375 F.Supp. at 72. Judged by this standard, Koratron has not made the requi-

site showing. The 1967 change in patent license forms was far from an unequivocal abandonment of the trademark tie provision. The new form included changes in addition to the elimination of the trademark tie. The parties are sharply divided as to whether these changes deterred existing licensees from changing over to the new form. It is clear that a number of existing licensees did not change, and that at least one licensee wrote to express concern over the other changes, suggesting that the new form was perceived as less advantageous than the old. Furthermore, when the new form was made available, Koratron adamantly stated, both publicly and privately, that the licensees had to choose one form or the other and that they would be bound by all of the provisions of the one that they chose, including the trademark tie under the old form.[3] The fact that Koratron adopted this posture suggests that it perceived some additional benefit to it from the other changed provisions of the new form. Had Koratron wanted to abandon the trademark tie, many clear methods for doing so were available to it. For reasons known only to Koratron, it did not elect to employ those methods. In

**3.** The press release for February 21, 1968, described the change in forms as follows:

"In late December 1967, Koratron Company announced the adoption of a new form license agreement and the first signing of such form by a new licensee. Under the terms of a Koratron license, any issuance of a more favorable agreement must be made available to all licensees.

"Designed to simplify and clarify the license, the major difference between old and new agreements is the changing of the use of the trademark KORATRON from a right and obligation to a privilege. A licensee, under the new form, may use Koratron's patented process without availing himself of the privilege of using the trademark. When a licensee continues under the old form license, he must use the trademark KORATRON if his garments pass Koratron Company's Quality Control Standards.

"While many licensees have not yet accepted the new form of agreement and therefore continue under the old form, the new form will be used for all future licensees. 'The offer of the simplified more favorable license remains open to all licensees, but whether a current

licensee has chosen to continue under the old form or has availed/or avails himself of the new form is immaterial to us,' said Arthur F. Cunningham, Executive Vice President of Koratron Company, Inc.

"Cunningham further stated, 'The obligation of the licensee to pay a 1% royalty regardless of the source of the fabric or the trademark it bears is the same under either form of license, though we believe a licensee will find it to his advantage to use fabric bearing the trademark KORATRON because such fabric has been quality tested by us.'

"Koratron Company is backing the trademark KORATRON with a multi-million dollar advertising program featuring full-page ads in twenty national magazines. Strong TV Spot schedules will be utilized in selected markets and the entire package brought to the attention of retail buyers through the use of nine leading trade publications.

" 'Last but not least,' said Cunningham, 'current enforcement practices, which have resulted in the bringing of an infringement suit against a non-licensee and audits of and an arbitration against licensees, will be materially accelerated.' " (Emphasis added.)

the Court's opinion, the militant manner in which Koratron put its licensees to their election of license forms eliminates Koratron's argument that the misuse ended through attrition and benign neglect.

Koratron has presented a number of arguments concerning the trademark tie, each succeeding argument representing a slight retreat and retrenchment based on the assumption that the preceding position was lost. The offer of new license forms without the trademark tie to all licensees in December of 1967 was, in Koratron's opinion, sufficient to end the misuse associated with the trademark tie. Failing that, Koratron argues that, in any event, there were so few old-form licenses outstanding after December of 1967 that the misuse had in all practical effect stopped. The second argument is tied to a third one, namely, that the renewal of the old-form licenses with the trademark tie by licensees who had acquired their original licenses prior to December of 1967 did not continue the misuse, because there was nothing that Koratron could do to stop the renewal. Finally, Koratron argues that under no interpretation could the misuse be held to extend beyond June 25, 1975, when the last of the old-form licenses expired, so that Koratron is entitled to some damages, however small, for the infringement during the truncated period following that expiration.[4] Lion, not surprisingly, argues that this misuse continued actively so long as any outstanding license contained the trademark tie. Lion further argues that some affirmative action by Koratron was necessary to dissipate the effect of the misuse once the last old-form license expired and that since such action was not forthcoming, Koratron continues to be barred from enforcing its rights.

The Court's conclusion is strongly supported by, but not dependent upon, the decision of the Court of Appeals for this Circuit in *Berlenbach v. Anderson and Thompson Ski Co.,* 329 F.2d 782 (9 Cir.), *cert. denied,* 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964). That decision provides particularly valuable guidance for the application of the doctrine of patent misuse in the specific context of an abusive license provision. In *Berlenbach* the plaintiff-patentee had granted a license under the patent to a non-party licensee which precluded the licensee from manufacturing or distributing any products competing with the patented product. The defendant did not hold a license with the restrictive provision but did hold a non-exclusive license which had been granted pursuant to a consent decree which had been entered subsequent to the granting of the restrictive license. Despite the fact that the defendant company was not bound by the restrictive license provision, the Court of Appeals held the defendant company could rely upon it for its misuse defense. The plaintiff-patentee's argument that it should not be barred from enforcing its rights under the patent, because it had never attempted to enforce the abusive provision was flatly rejected by the court:

"In view of the history and policy of the defense of patent misuse we find no merit in appellant's contentions that the proof of substantial lessening of competition is a prerequisite to finding patent misuse. * * *

" * * * Appellant argues that he will prove, if permitted to, that he never enforced paragraph 4 of the

---

4. In the briefs, considerable effort was expended by the parties in contesting the interpretation of the Stipulation which states that up to the date of the Stipulation, Lion was infringing the patent as its scope was defined in the earlier opinion. The disagreement was whether the date of the Stipulation was the date the parties signed it, June 16, 1975, or the date it was filed, July 15, 1975. The difference was potentially important if the Court held that the patent could be enforced as of June 25, 1975, the date on which the last of the licenses with the trademark tie finally expired. This issue was eliminated at oral argument when counsel for Lion further stipulated orally that Lion has continued to do what it was doing at the time of the Stipulation. Furthermore, the Court's holding on the dissipation issue eliminated the importance of the June 25th date, and thus of this issue.

Northland agreement. He contends that non-enforcement of the provision is tantamount to abandonment of the improper practice and dissipation of its consequences within the meaning of the language just quoted. If this is not an issue of 'material' fact, it is of no avail to appellant's efforts to reverse the summary judgment. As we view the present state of the law, the question of enforcement is immaterial.

\* \* \*

"Although we have said that non-enforcement *and* voluntary relinquishment of an illegal clause will overcome the defense of patent misuse [footnote omitted], we know of no case permitting an infringement suit where the clause remains in effect but unenforced." *Id.* at 784–785.

Because of the existence of outstanding licenses with the trademark tie, Koratron is precluded from enforcing its rights under the '432 patent for the period ending June 25, 1975. After that time, active patent misuse with respect to the trademark provision ceased, and the revival of Koratron's right of enforcement depends upon the dissipation of the effects of the prior misuse. Since enforcement requires dissipation of the effect of all of the patent misuse previously found by the Court, the issue of the dissipation of the effect of the trademark misuse must be viewed in the broader context of total dissipation. For reasons more fully set out in the following discussion of the Dan River agreement and the Swede consent decree, the Court concludes that some positive action was required to dissipate the trademark misuse, and since none has been taken, dissipation has not occurred.

B. *The Dan River Agreement and the Swede Consent Decree*

 Dan River is a large, diversified textile manufacturer which has been actively involved in the development of a crease-resistant fabric since 1947. In 1964 research efforts by the company led to the development of a process for the production of crease-resistant fabric, which became known as the Dan Press process. Because of concern over the potential conflict between the '432 patent and the Dan Press process, Koratron and Dan River on October 14, 1965, entered into an agreement which was summarized in the earlier opinion:

"By the agreement, Dan River disclosed the Dan Press process to Koratron [footnote omitted] and agreed not to attack the validity of '432 through a lawsuit. Koratron released and agreed not to take legal action against Dan River and users of Dan Press \* \* \* based upon any claims for royalties or for patent infringement under its patents. At that time, Koratron claims, it believed that the Dan Press process was not within its '432 patent. It now contends that Dan River misrepresented the Dan Press process to it." 375 F.Supp. at 50.

After entering into the Dan River agreement, Koratron entered into a consent decree with Swede Sportswear, Inc., a small Los Angeles-based garment maker, against which Koratron had brought an infringement action. As stated in the earlier opinion:

"Swede had never been a Koratron licensee, but it had used Koratron-trademarked fabric in manufacturing garments. It also had manufactured garments made of Dan Press fabric. Koratron alleged generally that Swede had infringed the '432 patent. It did not specify the use of any particular fabric by Swede as constituting the infringement." *Ibid.*

Publicized by way of a press release and further described in an article in Time Magazine, the consent decree created a significant potential for confusion.

"In that decree, entered on October 18, 1965, Swede acknowledged that the '432 patent was valid and that it had infringed that patent [footnote omitted]. Swede had indeed used Koratron-trademarked fabric in producing garments, and the damages that Swede paid to Koratron were apparently determined from the patent royalties due as a result of that use and

perhaps use of other non-Dan Press fabric. But the language of the consent decree did not specify that the use of Dan Press fabric by Swede had not infringed '432 nor that Swede had paid no damages resulting from that use. [footnote omitted] Dan River was never publicly identified with the Swede litigation, and, of course, the Swede consent decree was never publicly linked to the secret agreement between Koratron and Dan River." *Id.* at 50–51.

The Dan River agreement was analyzed under several theories of potential liability. The Court held that it did not constitute a market division *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by Koratron and Dan River. The Court also held that the actions taken with regard to the Dan River agreement did not constitute an unreasonable restraint of trade in violation of Section 1. As stated in the earlier opinion:

"Information as to how Koratron and Dan River viewed the scope and validity of '432 would indeed have been valuable to other parties in the industry. But Dan River and Koratron had no duty to disclose an otherwise lawful agreement simply to facilitate those parties' business judgment." *Id.* at 54.

The Court held that the related settlement of the Swede litigation was "an abuse of the judicial process", but not "an unreasonable restraint of trade".

*Id.* at 55. However, like the trademark tie, the Dan River agreement and the Swede consent decree were central to the Court's finding of attempted monopolization by Koratron in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[5]

Koratron argues that dissipation of the effects of the Dan River agreement is a fact established by the Stipulation between the parties. The Stipulation states:

"The fact that Koratron executed an agreement with Dan River Mills did become a matter of general knowledge in the trade after a copy of that agreement was attached to Koratron's answer to the complaint filed in action No. 50063, one of the consolidated cases, in December 1968." Stipulation ¶ 8, pp. 4–5.

Koratron's argument assumes that dissipation requires nothing more than the dissemination of information in the trade concerning the misuse. In the Court's opinion, this is an improper assumption, although dissemination of truthful information is an important measure of dissipation. Even on Koratron's assumption, however, its argument fails.

The only act designed to disseminate information concerning the Dan River agreement undertaken by Koratron was its issuance of a press release dated March 20, 1968.[6] While the press release

---

**5.** "In this case, the Court's finding that Koratron's licensing practices constituted illegal tying arrangements itself shows that Adversaries' claim of an attempt to monopolize is founded upon a substantial claim of restraint of trade [footnote omitted]." 375 F.Supp. at 70.

"The Court finds that the tying arrangements and Koratron's enforcement of them [footnote omitted], the Dan River agreement [footnote omitted], and the Swede consent decree [footnote omitted] are persuasive and convincing evidence that during the time in question Koratron possessed the specific intent to extend unlawfully, in an attempt to monopolize, the power legally granted to it through the issuance of the '432 patent. These practices and agreements, considered together, render it highly unlikely that Koratron was merely exercising innocent business

judgment as to how it could best compete in the marketplace." *Id.* at 70–71.

**6.** That press release reads as follows:

"There appear to be some misconceptions floating around in the trade about the garment maker's obligation to Koratron under the Koratron patents when making permanent press garments using fabrics loosely called "dan press" and/or bone dry. 'Being bone dry or calling a fabric dan press does not take its use outside of the scope of our patents,' it was announced today by Arthur F. Cunningham, Executive Vice President of Koratron Company, Inc. 'However, if a fabric is purchased from Dan River Mills the garment maker may or may not be relieved from claims by Koratron because of an arrangement of 1965.'

" 'Said arrangement provided that, for a separate and independent consideration, Koratron

purports to describe the Dan River agreement, it does so in a plainly inaccurate and misleading fashion. The press release reflects Koratron's continuing claim to royalties based on garments made from *all* bone dry fabrics save "a limited type of Dan River fabric". Koratron thus created a climate of uncertainty and confusion regarding the relationship between the '432 patent and the Dan Press process in the very document in which the "arrangement" was revealed to the public. Although the Stipulation states that the fact of the agreement became general knowledge in the trade after the agreement was attached to a pleading in 1968, it does not state that the confusion regarding the relationship of the two processes was eliminated.

Furthermore, the Stipulation does not speak at all to the confusion and *in terrorem* effect of the publicity which flowed, as intended by Koratron, from the Swede consent decree, which had no generally known connection with the Dan River agreement. The Stipulation states:

"Neither Koratron nor Koracorp made any communication to Koratron's licensees respecting the Dan River agreement or the Swede agreement save and except that as shown by the evidence in the trial of the consolidated cases." Stipulation, ¶ 8, p. 4.

The evidence at trial established that the facts pertinent to the relationship between the Dan River agreement and the Swede consent decree came to light in depositions completed in October, 1971, well after the present litigation had commenced. There is no showing in the record, however, that the facts thus available to the parties were made available by Koratron to other licensees in any communication whatsoever. After the March 20, 1968, press release, requests for copies of the Dan River agreement were uniformly rejected by Koratron. Nothing in this record suggests that Koratron's practice in this regard changed once the agreement became a matter of public record.

Had Koratron acted in good faith to make a full and meaningful disclosure, it could have done so by letter or press release. Instead, Koratron elected to do nothing, for reasons known only to it. It may not enforce the '432 patent before such time as it has discharged in full measure its equitable duty of disclosure. This record is void of any evidence that it has done so.

More fundamentally, dissemination of information alone may not be sufficient to establish dissipation. In its first opinion, the Court found that the misuse associated with the Dan River agreement and the Swede consent decree did not flow from their secrecy and lack of disclosure, because the other firms in the industry were capable of obtaining advice regarding the validity of the patent. Rather, the Court held:

"[T]he tying arrangements and Koratron's enforcement of them [footnote

---

would not collect royalties from garment makers using a limited type of *Dan River* fabric, despite the fact that the use of the fabric was within the scope of the Koratron patents. The arrangement does NOT apply to use of any fabric made by mills other than Dan River. DAN PRESS is a registered trademark of Dan, River Mills, and we are informed by Dan River that it does NOT define a process or class of fabrics in the industry,' Cunningham said.

"Mr. Cunningham also emphasized that the Dan River fabric to which the 1965 arrangement applies, and the use of which is within Koratron's patents, 'is one which will not produce a satisfactory permanent press garment, *in our opinion,* for all applications—especially trousers, because it is a fabric which is heated by Dan River to dry it to less than 1% moisture with certain other consequences. We have been informed by Dan River that it will use the trademark DAN PRESS only on fabrics of this particular type.

" 'Therefore,' continued Cunningham, 'it is a mistake to believe that the purchase and use of all so-called dan press fabric for post cure permanent press operations will provide a magic cloak against claims by Koratron for royalty and infringement.' It was further stated by Cunningham that 'Koratron cannot tolerate violations of its rights, and pursuit of all claims will be accelerated, which, of course, includes those arising from any misconceptions concerning the use of these so-called dan press fabrics.' "

omitted], the Dan River agreement [footnote omitted], and the Swede consent decree [footnote omitted], are persuasive and convincing evidence that during the time in question Koratron possessed the specific intent to extend unlawfully, in an attempt to monopolize, the power legally granted to it through the issuance of the '432 patent." 375 F.Supp. at 70–71.

Koratron responds to this finding of misuse by arguing that all of the elements necessary for a finding of attempted monopolization are no longer present. For example, it argues that because of the economic reverses of the company, there is no longer any dangerous probability of success of an attempt to monopolize. This argument simply misses the point. Misuse is not co-equal with an antitrust violation. Moreover, the focus of the Court's analysis was the *intent* that Koratron's conduct evidenced, a factor appropriate for a court of equity which must decide whether to remove a sanction for prior bad acts. This factor was made explicit in a footnote to the discussion of patent abuse:

> "On the question of patent misuse, the burden on other parties in the market to make their own business judgments about the scope and validity of a patent is not a strong consideration. * * * *The patentee must itself maintain high standards of conduct and candor if it is to use its patent properly."* *Id.* at 72, n. 104 (emphasis added).

Although the Court sits as a court of equity in deciding issues involving the misuse doctrine, it does not require positive action by Koratron merely for the expiation of past sins. Given the multiplicity of misuses and their undoubtedly far-reaching effects, the Court simply is not convinced that Koratron's essentially passive approach can be said to have dissipated the effects of the misuses. The actions which were taken by Koratron were at best equivocal and at worst supportive of the misuse. Unable to point to any specific efforts to dissipate the effects of the misuse, Koratron attempts to build its case on a foundation of what it frequently describes as economic "reality". In short, Koratron has simply taken refuge in the general tendency of time to heal old wounds. This, the Court is convinced, is not sufficient in the context of a case such as this one where thorough and calculated misuse has yielded to the patent holder illicit gains of staggering proportions.[7] Furthermore, there is a practical defect in the position that Koratron has been forced to adopt due to its previous inaction, because it requires the Court to inquire into matters which are not easily susceptible of clear proof and to resolve all uncertainties in favor of Koratron.

The Court will not give an advisory opinion as to what action would be necessary to achieve dissipation, but it notes that Lion appears to concede that the effects of the mill tying agreements have been dissipated. With respect to those ties, Koratron expressly waived any intention of enforcing the agreements. Such an approach might be appropriate with respect to the trademark tie. Press releases contributed to the misuse associated with the Dan River agreement and the Swede consent decree. They might be used to equal advantage in dissipating those effects. Ultimately, however, the decision as to the necessary affirmative action is that of Koratron.

## II. ATTORNEYS' FEES

■ The parties have stipulated that:

> "Lion has incurred costs, expenses and attorneys' fees reasonably allocable to Lion's misuse defense to the complaint and to Lion's antitrust coun-

---

7. During the period from 1964 through 1969 the gross royalties received by Koratron from its licensees under the '432 patent totaled $28,128,368. 375 F.Supp. at 61. In the context of such enormous financial benefits received by Koratron while there was active patent misuse, Koratron's argument that it sufficed for it simply to wait until the market power of the patent had been eroded is especially unconvincing to a court of equity.

terclaim. The parties stipulate that the reasonable amount of such costs, expenses and attorneys' fees is $10,-000." Stipulation, ¶ 7, p. 4.

With the amount expended having been established, the issue before the Court is whether Lion is entitled to recover such an award. Lion advances two theories in support of its claim. Although the two theories are different, they are both based upon the language of Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides, in relevant part, as follows:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Lion's first argument is that it is entitled to attorneys' fees for its successful assertion of antitrust violations by Koratron. Lion argues in its briefs that it has been injured in its business or property by reason of Koratron's violation of Section 2 of the Sherman Act, although the expense of proving those damages would be more expensive than any anticipated recovery. Koratron has resisted the award of attorneys' fees, arguing, first, that the Stipulation establishes that Lion has not met the requirement of injury to its business or property, and second, that even if Lion were so injured, the overwhelming weight of authority forbids the award of attorneys' fees in the absence of a treble damage award. Because the Court has concluded that both of Koratron's arguments are well founded, Lion is not entitled to an award of attorneys' fees.[8]

A fair reading of the Stipulation negates any injury to the business or property of Lion as required by Section 4 of the Clayton Act. The Stipulation states:

"Said sum [of $10,000 representing costs, expenses, and attorneys' fees]

represents *the only amount for injury to its business or property claimed by Lion to be proximately caused by any violation of the antitrust laws by Koratron or Koracorp.*" Stipulation, ¶ 7, p. 4 (emphasis added).

Section 4 clearly contemplates that the injury that must be sustained before suit can be brought is injury other than the expenditure of attorneys' fees and associated costs. There is no showing of the requisite injury in the record before the Court.

Even if the Court were to find that Lion has suffered some actual, although entirely unquantified and therefore unrecoverable, injury to its business or property, Lion would not be entitled to recover attorneys' fees. "In a long line of cases the courts have interpreted this section of the Clayton Act not to permit plaintiffs to recover attorneys' fees unless treble damages are awarded, regardless of whether injunctive relief is granted." *Byram Concretetanks, Inc. v. Warren Concrete Prod. Co. of N. J.*, 374 F.2d 649, 651 (3 Cir. 1967). If any exception is to be carved out of this general proposition, this is not the case in which it need be attempted.

Lion's second argument relies on the authority that in certain limited circumstances attorneys' fees can be viewed as damages subject to trebling under Section 4 of the Clayton Act. The Court of Appeals for this Circuit has recently clarified the requirements for this type of recovery. In *Rex Chainbelt Inc. v. Harco Products, Inc.*, 512 F.2d 993, 1005 (9 Cir. 1975), the court stated:

"The mere coincidence of an antitrust violation and a patent infringement suit is not sufficient to entitle [the claimant] to attorney's fees expended in defense of the patent infringement claim absent some showing from which the trial court can find, or infer, *that the patent infringement suit was brought in furtherance and as an integral part of a plan to violate*

---

8. Lion impleaded Koracorp, Inc., the parent company of Koratron, for the antitrust violation. The Court's holding that Lion is not enti-tled to an award of attorneys' fees makes it unnecessary to explore the legal implications of that relationship.

*the antitrust laws."* (Emphasis added.)

In the Court's opinion, the evidence here is not sufficient to justify a finding that Koratron initiated its infringement suit in bad faith and as part of a plan to violate the antitrust laws. Accordingly, Lion is not entitled to recover its attorneys' fees under the second theory.

This Memorandum of Opinion shall constitute the Court's Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

Counsel for plaintiff are directed to prepare an appropriate form of judgment in accordance with the views set forth in this Memorandum of Opinion.

## APPENDIX 1

### STIPULATION FOR SUBMISSION OF THE CASE

WHEREAS, the above-entitled action (hereafter referred to as "this action") was one of several consolidated for trial and heretofore partially tried under the caption of *Jack Winter, Inc.,* a corporation, plaintiff, *v. Koratron Company, Inc.,* a corporation, Counterclaimant, *v. Jack Winter, Inc., a corporation, Counterclaim Defendant, etc.,* 375 F.Supp. 1 (N.D.Cal.1974) and other cases, etc. (hereafter referred to as the "consolidated cases"), as more fully appears in the opinion of the Court reported as *Jack Winter, Inc. v. Koratron Company, Inc.,* 375 F.Supp. 1 (hereafter called the opinion of the Court); and

WHEREAS, subsequent to that opinion all the other cases so presented and tried have been settled and dismissed, and it is desired to submit the present case for decision expeditiously,

IT IS HEREBY STIPULATED between the parties Koratron Company, Inc. (hereafter called "Koratron"), Koracorp Industries Inc. (hereafter called "Koracorp"), and Lion Uniform, Inc. (hereafter called "Lion"), as follows:

1. A Supplemental Complaint may be deemed to have been filed herein by order of the Court alleging that the claimed infringement by defendant Lion has continued to the date of this stipulation, and defendant may be deemed to have filed an answer to the Supplemental Complaint in the same form as that of its original answer.

2. All orders of the Court heretofore made in the consolidated cases and applicable to this action shall continue to be applicable.

3. The evidence on which this action may be deemed submitted for decision shall be (a) all the facts admitted in the Pretrial Order of March 20, 1972 in the consolidated cases, plus all evidence heretofore introduced during the partial trial of the consolidated cases, all objections made during that trial being reserved, plus (b) the facts stipulated to in the remainder of this stipulation.

4. In 1964, 1965, 1966 and again in 1968, Koratron offered to license Lion under U.S. Patent No. 2,974,432 (hereafter referred to as the '432 patent) and solicited Lion, both orally and in writing, to enter into a license agreement. Lion declined to enter into a license agreement and never became a licensee under the '432 patent. After 1968 Koratron did not again solicit Lion to become a licensee, Lion did not seek or request a license, and Koratron did not refuse to license it. The license offered by Koratron to Lion in 1968 was in the form of the document a copy of which is marked as Exhibit A hereto ("new form").

5. Beginning in 1965 and continuing to date Lion has manufactured and sold and continues to manufacture and sell permanent press garments. In lieu of the costs and expenses necessarily involved in the discovery and trial with respect to the remaining issues and without reference to any fact but solely to provide a basis for prompt conclusion of this litigation, the parties stipulate that prior to the date of this stipulation Lion manufactured one or more garments falling within the scope of the '432 patent as heretofore defined by the Court in its opinion; accordingly, (1) in the event that the Court were to conclude that Koratron is not precluded from recovery

of damages for infringement by reason of misuse of the '432 patent in whole or in part and is therefore entitled to judgment for damages for infringement in some amount, and holds that the scope of the '432 patent is as heretofore defined by the Court in its opinion, and (2) because the parties believe that an effort to allocate the damages for infringement to such period as may be proper as a matter of fact or law up to the date of this stipulation would be more costly than warranted by the amounts involved, the parties agree that the following are appropriate sums for such judgment, said sums being allocated to the time period indicated for such determination as the Court deems proper to make and said sums to include all recoverable costs and to be without prejudice to retrial of any issue in the event that any aspect of this Court's judgment be reversed upon appeal:

| Calendar Year or any Applicable Part Thereof | Amount |
| --- | --- |
| 1965 | $500 |
| 1966 | 500 |
| 1967 | 500 |
| 1968 | 500 |
| 1969 | 500 |
| 1970 | 500 |
| 1971 | 500 |
| 1972 | 500 |
| 1973 | 500 |
| 1974 | 500 |
| 1975 | 500 |

6. If the scope of the '432 patent is as contended for by Koratron, Lion has used the process of the '432 patent to make permanent press garments to a substantially greater extent than it has done if the scope of the '432 patent is as heretofore defined by the court in its opinion; an offer of proof by Koratron of such substantially greater use may be deemed to have been made and rejected by the Court as irrelevant.

7. Lion has incurred costs, expenses and attorneys' fees reasonably allocable to Lion's misuse defense to the complaint and to Lion's antitrust counterclaim. The parties stipulate that the reasonable amount of such costs, expenses and attorneys' fees is $10,000. Said sum represents the only amount for injury to its business or property claimed by Lion to be proximately caused by any violation of the antitrust laws by Koratron or Koracorp.

8. Neither Koratron nor Koracorp made any communication to Koratron's licensees respecting the Dan River agreement or the Swede agreement save and except that as shown by the evidence in the trial of the consolidated cases. The fact that Koratron executed an agreement with Dan River Mills did become a matter of general knowledge in the trade after a copy of that agreement was attached to Koratron's answer to the complaint filed in action No. 50063, one of the consolidated cases, in December 1968.

9. The new form was offered to all licensees by letter in the form of Exhibit C hereto, mailed on or about December 20, 1967, and was the only form used with garment makers first becoming licensees after December 15, 1967. Some licensees having licenses in the form of the documents copies of which are marked as Exhibits B–1 and B–2 (old form), having signed such documents before December 15, 1967, did not accept the offer and continued as signatories to the old forms and paid royalties for some period after December 1967 as indicated below. Fourteen of such old form licensees exercised in due course the option granted by the old forms to renew, but none exercised the option to renew a second time. On April 15, 1970, 90 licensees under the '432 patent were paying royalties, of which 21 were signatories to the old form and 69 to the new form. Of those 21 signatories to the old form, 14 were the 14 who had exercised the option to renew, and 7 had licenses executed before December 17, 1967 and not renewed. Concerning these 7, the 5 years from date of execution expired as follows:

One on August 19, 1970

One on October 12, 1970

One on February 15, 1971, but no royalties were paid after June 17, 1970

One on March 25, 1971

One on May 4, 1971, but no royalties were paid after December 31, 1970

One on July 1, 1972, but no royalties were paid after January 1, 1972

One on July 31, 1972, but no royalties were paid after April 30, 1971.

None of the 21 licensees referred to above accepted Koratron's offer to execute the new form. Concerning the 14 who exercised the option to renew granted by the old form, the facts are as follows: One never paid any royalties after exercising the option to renew on April 30, 1970. One gave written notice on November 29, 1972 that it was not using the licensed process. One, who exercised the option to renew on October 15, 1969, paid no royalties after February 11, 1974. One gave written cancellation of the license on February 21, 1974, but paid no royalties after September 30, 1973. One gave written notice on February 12, 1974, that it was not using the process. One, who had exercised the option on August 1, 1969, paid no royalties after December 31, 1973. One, who had exercised the option on October 29, 1969, paid no royalties after December 31, 1970. One gave written notice of cancellation on December 17, 1973. One, who had exercised the option on November 1, 1969, paid no royalties after March 31, 1973. One, who had exercised the option to renew on July 26, 1969, paid no royalties after March 31, 1973. One, who had exercised the option on March 31, 1970, paid no royalties after March 31, 1972. One, who had exercised the option on June 25, 1970, paid no royalties after December 31, 1973. One exercised the option on August 21, 1969, and another exercised it on September 16, 1969; both of these licensees paid royalties through the expiration of the five-year license terms in August and September 1974. In addition to the licensees paying royalties there were a number of licenses in the old form with respect to which five years from the date of execution had not yet elapsed by April 15, 1970. As re-spects such licenses either (1) no royalties were ever paid with respect thereto; or (2) the licensee sent a letter of cancellation or went out of business; or (3) the licensee had discontinued paying royalties before April 15, 1970. None of such licensees accepted Koratron's offer to execute the new form.

10. At no time did Koratron cancel any of the terms of its license agreement in effect as of December 20, 1967, except to the extent that it offered and licensees accepted Koratron's letter offer dated December 20, 1967. At no time did Koratron offer to return royalties paid by licensees from the commencement of its licensing program to date.

11. The total number of garment manufacturer licenses under the '432 patent reached its maximum in 1966 and thereafter steadily diminished. By April 15, 1970 the number of such licenses was approximately one-fourth of what they had been at the maximum. Royalties from such licensees reached their maximum in 1966 and diminished steadily thereafter. In 1969 they were approximately one-third of what they had been at the maximum and declined in 1970 and afterwards. Until approximately September 1974 Koratron continued to receive royalties from garment manufacturer licensees who were signatories to old form licenses. The amount of such royalties is as follows:

| 1968 | $ 1,841,210.17 | 1972 | $ 62,858.09 |
| 1969 | 683,256.22 | 1973 | 26,639.72 |
| 1970 | 325,362.72* | 1974 | 6,933.25 |
| 1971 | 164,740.92 | Nothing thereafter. | |

12. In 1967 Koratron was advised by its patent counsel, Messrs. Lyon and Lyon, that the '432 patent was valid and had the scope contended for by Koratron in this case.

Dated: June 16, 1975.

July 15, 1975.

So ordered.

---

* Of this amount, $59,953.92 was from those whose licenses ceased to be in effect before April 15, 1970.