**In re YARN PROCESSING PATENT VALIDITY LITIGATION.**

**M.D.L. Docket No. 82.**

United States District Court,
S. D. Florida.

June 12, 1979.

---

James L. Armstrong, III and Hugh Turner and James Crabtree, Smathers & Thompson, Miami, Fla., for Lex Tex Ltd., Inc.

William K. West, Jr., Cushman, Darby & Cushman, Washington, D. C., for Burlington Industries.

Dale H. Hoscheit and Gene W. Stockman, Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., for Monsanto of North Carolina, Inc.

Wallace D. Newcomb, Philadelphia, Pa., for Collins & Aikman.

David Rabin, Greensboro, N. C., for Dow-Badische Co., National Spinning Co., Collins & Aikman and Glen Raven Mills, Inc.

David Klingsberg and David F. Ryan, Kaye, Scholer, Fierman, Hays & Handler, New York City, for National Spinning Co., Dow-Badische Co. and Hoechst Fiber Industries.

Philip Koenig, Boston, Mass., and C. Reed Guthridge, Miami, Fla., for Leesona Corp.

Arthur O. Cooke, Cooke & Cooke, Greensboro, N. C., for ARCT.

## MEMORANDUM OPINION ON PURGE

ATKINS, Chief Judge.

The history of this litigation is complex and has been dealt with in various other opinions.[1]

Lex Tex is the owner of three double heater patents, 3,091,912, 3,077,724 and 3,472,011, which involve the false twist processing method of producing synthetic yarns.[2] The '912 and '724 patents were assigned to Lex Tex by Leesona Corporation of Warwick, Rhode Island, and the '011 patent was acquired from the British company of Ernest Scragg and Sons, Ltd. Lex Tex had previously sued several producers

1. See *In re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127 (5th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977); *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *In re Yarn Processing Patent Validity Litigation*, 341 F.Supp. 376 (J.P.M.L.1972).

2. A description of the false twist process is found in Appendix A of Judge Dupree's opinion in *Duplan Corp. v. Deering Milliken*, 444 F.Supp. 648 (D.S.C.1977), *rev'd in part*, 594 F.2d 979 (4th Cir. 1979).

of textured yarn called throwsters for infringement under these patents. The cases were transferred before this Court for consolidated pretrial proceedings under 28 U.S.C. § 1407, by the Judicial Panel on Multidistrict Litigation. This Court granted summary judgment for the Throwsters finding Lex Tex's patents misused and unenforceable. 398 F.Supp. 31 (S.D.Fla.1975). The Court of Appeals affirmed, holding that the patent holder had misused its patents due to licensing agreements it had entered into with three machinery manufacturers, Leesona Corporation, Barmag Barmer Maschinefabrick, AG, and Scragg. 541 F.2d 1127, 1139–42 (5th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).[3]

The illegal aspect of the licensing agreements found by the Court of Appeals was paragraph (5),[4] which guaranteed the manufacturers a percentage of the compensation received by Lex Tex on machines sold by them and licensed by the patent holder. The court held this arrangement constituted price fixing violative of the Sherman Act under *United States v. Line Material*, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1947), and therefore the patents were misused and unenforceable. 541 F.2d at 1141–42.

Lex Tex brought another round of infringement actions against several other throwing companies and machinery manufacturers alleging infringement of these three patents. These cases were again transferred to this Court under § 1407. The Court, in an order entered on August 23, 1978, applied collateral estoppel to preclude relitigation of the misuse issue by Lex Tex, and held that Lex Tex could not enforce its patents prior to January 1, 1973.[5]

---

3. An agreement was entered into between Lex Tex and Leesona on September 22, 1967. The agreement with Barmag was concluded on February 21, 1969, and the one with Scragg on June 16, 1971.

4. Paragraph 5 of the Scragg agreement is as follows:

"As an inducement to SCRAGG to continue building and improving DOUBLE–HEATER MACHINES, LEX TEX will pay to SCRAGG a share amounting to Twelve-and-One-Half (12½%) Percent of all gross royalties attributable to the aforesaid SCRAGG and LEX TEX PATENTS and collected by LEX TEX in accordance with a License Agreement concluded between LEX TEX and any person, firm or other entity (said License Agreement hereinafter referred to as a 'CUSTOMER USER LICENSE') for the use of any DOUBLE–HEATER MACHINES manufactured by SCRAGG, less the reasonable costs of collection not to exceed Ten (10%) Percent of the amount collected.

In the event an arrangement such as set forth in this provision is hereafter concluded between LEX TEX and another machinery manufacturer but which provides for a greater share of the royalties for such manufacturer, then, and in that event, the share of SCRAGG presently set to amount to Twelve-and-One-Half (12½%) Percent will be increased to the highest share which is being paid by LEX TEX to another machinery manufacturer.

With respect to any DOUBLE–HEATER MACHINE which is being operated under a CUSTOMER USER LICENSE, LEX TEX hereby releases SCRAGG from any liability for infringement, direct or contributory, of the LEX TEX or SCRAGG PATENTS and further indemnifies SCRAGG from any liability for infringement direct or contributory of U.S. patent Number 2,303,103 insofar as the use of such licensed machine would constitute an infringement of that patent."

5. The Court also held that res judicata precluded Lex Tex from seeking to recover damages from defendant Dow Badische Co. for any alleged infringement of the double heater patents that may have occurred prior to January 25, 1974.

In an order filed October 12, 1978, the Court modified its August 23 order to preclude Lex Tex from seeking to recover damages from Dow Badische for any alleged infringement of its patents which may have occurred prior to and including August 29, 1974. The Court again rejected the Throwsters' argument that a finding of misuse presupposed a subsidiary finding that the misuse has not ceased or been abandoned. This Court restated the proposition that the issues of purge and misuse could be subject to separate consideration under *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957):

"Implicit in the Court's decision is the recognition that a finding of misuse does not necessarily presuppose a parallel finding that the misuse remained unpurged."

The Court concluded that the Fifth Circuit "merely affirmed" this Court's finding of misuse and made no determination on the issue of purge.

In an order dated April 25, 1979, this Court ruled the machinery manufacturers could also take advantage of the collateral estoppel ruling.

On October 4, 1978, the Court, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, ordered a bifurcated trial on the issue of purgation of the misuse found by the Court of Appeals. The Court also ordered "any party not presently subject to the jurisdiction and venue of the Court" who elected "to file a declaratory judgment action, to do so before October 24, 1978." Subsequently, several of the defendant Throwsters filed declaratory judgment actions on the purge issue before the Court which were consolidated with the other MDL 82 cases and the *Collins & Aikman* action already docketed in this forum.[6] The Court then entered an order precluding those Throwsters and machinery manufacturers who failed to file declaratory actions or stipulate to be bound by the result of the trial from asserting the defense of collateral estoppel upon remand of these cases to their respective transferor forums.[7] A consolidated bench trial on the issue of purge was then held as scheduled before this Court.[8]

## I.

## THE LAW OF PURGE

 As this Court stated on an earlier occasion, misuse is a defense arising out of the doctrine of "unclean hands." The doctrine of misuse developed based on "the strong public policy against allowing one who wrongfully uses a patent to enforce it during the misuse, the remedy of purge has developed, requiring that there be a showing that a dissipation or purge of the misuse has occurred, before the patentee may enforce his patent." *In re Yarn Processing Patent Validity Litigation*, 472 F.Supp. 178 (S.D.Fla.1979); *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957). Courts have uniformly applied a two-prong

---

The Court found the public policy against allowing the patent holder to misuse his patent and the policy disallowing the use of the *in pari delicto* defense in antitrust cases outweighed any interest in penalizing the machinery manufacturers for their relative fault in the misuse. *See In re Yarn Processing Patent Validity Litigation*, 472 F.Supp. 178 (S.D.Fla.1979).

6. Collins & Aikman filed a declaratory judgment action before this Court on November 30, 1976, seeking that the '724, '912 and '011 patents be found misused and unenforceable by Lex Tex and among other relief, that Lex Tex pay Collins & Aikman treble damages for antitrust violations under Section 4 of the Clayton Act, 15 U.S.C. § 15. On April 28, 1977, this case was consolidated with the other transferred cases in MDL 82. *Collins & Aikman v. Lex Tex*, 76–6514–Civ–CA.

The following declaratory judgment actions were filed with the Court on October 31, 1978: *J. P. Stevens v. Lex Tex*, 78–5001–Civ–CA; *Gold Mills v. Lex Tex*, 78–5009–Civ–CA; *Dow Badische v. Lex Tex*, 78–5010–Civ–CA; *Monsanto Co. v. Lex Tex*, 78–5011–Civ–CA; *ARCT v. Lex Tex*, 78–5012–Civ–CA; *Avtex Fibers v. Lex Tex*, 78–5013–Civ–CA; *Unifi v. Lex Tex*, 78–5014–Civ–CA; *Burlington Industries v. Lex Tex*, 78–5016–Civ–CA; *Hoechst Fibers Industries v. Lex Tex*, 78–5017–Civ–CA.

The *Order For Consolidation* was filed on November 27, 1978. It stated in part:

"It is this Court's decision in the interest of disposing of all claims involved in the present litigation together that those cases be consolidated with MDL 82, pursuant to Rule 42 of the Federal Rules of Civil Procedure."

The Court was unable to consolidate the original transferred cases in any one forum for trial under 28 U.S.C. § 1404(a) because there existed no one forum where all the cases "might have been brought."

7. See 472 F.Supp. 174 (S.D.Fla.1979). In anticipation of, or pursuant to this order, Glen Raven Mills, Mafco Textured Fibers, Inc., National Spinning Co., Barmag Barmer Maschinefabrick, AG, American Barmag Corp., and Leesona Corporation stipulated to be bound by the result of the purge trial. Only Macfield Texturing failed to respond to the Court's directive.

8. Lex Tex had argued that there were legal and equitable issues that could be determined by resolution of fact issues common to purge on the one hand, and infringement and validity on the other. Therefore, Lex Tex contended that it had a right to a jury trial under *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). The Court rejected Lex Tex's argument, finding that there was an insufficient overlap of common facts to give the patent holder a jury trial on an equitable issue, and that it was also "prudential" to try the equitable purge issue before infringement and validity.

This Court also held that a finding of purge of the misuse was not tantamount to establishing a price fixing violation under the antitrust laws, and thus not triable by right to a jury. *In re Yarn Processing Patent Validity Litigation*, 472 F.Supp. 178 (S.D.Fla.1979).

test to determine whether purge has been effected. The patent holder must demonstrate a complete abandonment of the improper practices found to constitute the particular misuse *and* that the consequences of the misuse have been fully dissipated. *Morton Salt Co. v. G. S. Suppiger*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *B. B. Chemical Co. v. Ellis*, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942). The burden is on the patent holder to show purge, *B. B. Chemical Co., supra, Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 279 (6th Cir.), *cert. denied*, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964); *Ansul Co. v. Uniroyal, Inc.*, 306 F.Supp. 541, 560 (S.D.N.Y.1969), *mod. & aff'd* 448 F.2d 872 (2d Cir.), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1971); and the evaluation of the acts necessary to constitute purge of the misuse are largely within the trial court's discretion. *Preformed Line Products Co., supra*, at 279; *Koratron Co. v. Lion Uniform, Inc.*, 409 F.Supp. 1019, 1022 (N.D.Cal.1976). Thus, the question of purge is generally one of fact. *United States Gypsum Co. v. National Gypsum Co., supra.*

■ In the present case, the burden is on Lex Tex to show (1) that it has effectively abandoned the misuse by repudiating the illegal provisions in the licensing agreements; and (2) that the effects and consequences of the misuse have been dissipated. This Court holds that Lex Tex has carried that burden.

## II.

### REPUDIATION OF THE ILLEGAL PROVISIONS IN THE MANUFACTURERS' LICENSE AGREEMENTS

■ At the outset, Lex Tex must prove that it has effectively repudiated the illegality found in the manufacturers' license agreements by the Court of Appeals. The Throwsters contend Lex Tex has never successfully abandoned the illegal practices. To establish purge, the law requires the patent holder engage in clear and unequivocal affirmative action in abandoning the

misuse. *Koratron Co. v. Lion Uniform, Inc.*, 409 F.Supp. 1019, 1028 (N.D.Cal.1976). Mere non-enforcement of the illegal provision is itself insufficient abandonment under the law of purge. *Hensley Equipment Co., Inc. v. Esco Corporation*, 383 F.2d 252, 261 (5th Cir. 1967); *Berlenbach v. Anderson & Thompson Ski Co.*, 329 F.2d 782, 785 (9th Cir. 1964); *Koratron, supra*, at 1025.

The testimony of Timothy Dufort, former Chairman of the Board at Scragg, and two of Scragg's former employees, Messrs. Hacking and McNeight, indicates that at a meeting attended by McNeight and Hacking on October 10, 1972, Mr. Fredrick Tecce, Sr., 50% owner of Lex Tex, stated unequivocally that Lex Tex would make no further paragraph (5) payments to Scragg. According to the testimony, it was clear to all present and observing that thereafter, Scragg would receive no further "kickback" payments under that provision. Mr. Dufort also stated that he met with Tecce on October 19, 1972, and Tecce reiterated Lex Tex's position to him at that time. Dufort testified that Scragg did nothing about it because "[i]t was his business, not ours." Record at 1737–39.

Dufort also testified that the reason for the agreement was that when Scragg was approached by Lex Tex "we felt we ought to make arrangements with Lex Tex of some sort, because we did not wish to face an infringement action against ourselves or against our customers under those Lex Tex patents." *Id.* at 1721. According to his testimony, the paragraph (5) rebate provision played little or no role in Scragg's desire to enter into a licensing agreement with Lex Tex. *Id.* at 1722.

Lex Tex's subsequent activities with regard to these provisions were not similarly unequivocal. An illustration of this fence-sitting attitude adopted by Lex Tex is a letter sent from then Lex Tex President, R. G. Lubbers, Jr., to Barmag. The concluding paragraph of this letter, dated November 8, 1974, reads as follows:

"Will you therefore reply within ten days of receipt of this letter indicating your consent to cancel the aforementioned

agreement, that is, *all* understandings or agreements between us. Lex-Tex feels quite strongly that if you do not agree to cancel the agreement you should become a party to the lawsuit and assist in our mutual defense, preferably voluntarily."

The equivocation found in this paragraph is evident. Lex Tex clearly asked Barmag either to agree to terminate the agreement *or* to assist in the defense of the questionable provision.[9]

Another example of Lex Tex's equivocation with regard to the paragraph (5) rebate provisions is the publication in 1977 of misleading notices in a leading textile trade journal, *The Daily News Record*. These notices which purported to reflect the status of the MDL 82 litigation read in part:

"A favorable determination has been made in the Fifth Circuit litigation concerning an attack on the validity of Lex Tex patent product claims. Furthermore, the Court sustained only one of several asserted grounds of patent misuse by Lex Tex, and this ruling was based upon grounds which have ceased to or never did exist."

In his testimony, Mr. Robert F. Conrad, President and 50% owner of Lex Tex, attempted to show that these notices were correct and not misleading. It is unclear to the Court how Lex Tex can maintain that the statements "favorable determination" and "grounds which have ceased to or never did exist" were not misleading, or at least an incomplete representation of what that decision held. "[A]lthough [the] dissemination of truthful information is an important measure of dissipation," *Koratron, supra* at 1026, such misleading and incomplete dissemination is inconsistent with Lex Tex's affirmative duty of unequivocal repudiation.[10] These two examples are indicative of the general inertia and ambiguity of Lex Tex in its behavior towards Barmag and Leesona in the period from 1973 through mid-1977.

Final and effective repudiation of the illegal arrangements occurred in May of 1977, when President Conrad sent letters to the three manufacturers. In those letters, Conrad confirmed "that we have repudiated the royalty sharing provisions of the so-called 'machinery manufacturing license.'"[11] At that point, no doubt could have remained that Lex Tex would not attempt to enforce, benefit, or be bound in any way by the illegal provision.

The Throwsters argue that Lex Tex could not effectively repudiate the agreement without the acquiescence or consent of the manufacturers. They cite *Koratron, supra*, and *Westinghouse Electric Corporation v. Bulldog Electric Products Co.*, 179 F.2d 139, 146 (4th Cir. 1950) to support their position.

In *Koratron*, the court found the patentee had not purged because it had taken no positive action to dissipate the effects of the misuse. *Koratron* does not hold that when a patent holder expressly repudiates an illegal provision in a licensing agreement

9. The letter to Leesona dated November 8, 1974, addressed to Mr. Benn, President of Leesona Corporation, "requests your prompt agreement" to the deletion of the provisions in the agreement "requiring payment to Leesona of some portion of the royalty collected by Lex Tex from its licensees with respect to production made on Leesona machinery." This may have been enough standing alone for effective repudiation as to Leesona under *Metals Disintegrating Co. v. Reynolds Metals Co.*, 228 F.2d 885 (3d Cir. 1956), see footnote 12, *supra.* However, under all the circumstances, it cannot be said the abandonment was clear and unequivocal at that time. Lex Tex also wrote to Scragg on November 12, 1974.

10. Counsel for Lex Tex has asserted that the entire industry followed this litigation and therefore could correctly interpret the assertions made by Lex Tex in these notices. Accepting for a moment this speculative premise, the notices still were not "a full and meaningful disclosure." *Koratron, supra* at 1027. Not only did the Court of Appeals *not* find Lex Tex's patents valid, but the statement in the notices that the Fifth Circuit's ruling "was based upon grounds which have ceased to or never did exist" clearly could have done nothing but cause "a climate of uncertainty and confusion" regarding the status of Lex Tex patents. *See Koratron, supra.*

11. The letters to Barmag and Scragg were dated May 31, 1977. The letter to Leesona was dated May 16, 1977.

he cannot purge the misuse without the acquiescence of the other party to the agreement.

Nor does *Westinghouse* support the Throwsters' position. In that case, the Fourth Circuit held that unilateral action on the part of Westinghouse, in sending out a letter to licensees cancelling the illegal price maintenance provision in a licensing agreement, constituted sufficient abandonment of efforts at price control to constitute purge. The Court stated: "it is elementary that a party may waive a condition or stipulation made in his own favor." Although in the present case, the machinery manufacturers undoubtedly received or expected some benefit from the provisions, the major consideration for the agreements with Lex Tex, received by the manufacturers, was protection from infringement suits for themselves and their purchasers. The testimony of Mr. Dufort was that Scragg had decided to pass the rebates back to its customers, a policy that it believed was consistent with that of the other manufacturers. Record at 1776–77, 1858–59. Here, as in *Westinghouse*, the illegal provisions were severable and unenforceable. It is clear that if these provisions had been legal, after the letters of May 31, 1977, Lex Tex could not have insisted on compliance therewith under the doctrines of estoppel and waiver. *See Westinghouse, supra* at 146;

*Metals Disintegrating Co. v. Reynolds Metals Co.*, 228 F.2d 885 (3d Cir. 1956).[12]

In light of all these circumstances, this Court holds that an effective abandonment of the illegal price fixing arrangement was accomplished by the patent holder Lex Tex, through its unilateral actions on May 16 and May 31, 1977, of sending letters confirming repudiation to all three manufacturers. *See Metals Disintegrating Co., supra* at 889; *Berlenbach, supra* at 785; *Koratron, supra* at 1027.

Lex Tex's burden does not end here. The law of purge requires that Lex Tex show "that it has fully abandoned its present method of restraining competition . . . and that the consequences of that practice have been fully dissipated." *B. B. Chemical v. Ellis, supra*, 314 U.S. at 498, 62 S.Ct. at 408.

### III.

### DISSIPATION OF THE MISUSE

In finding that the patent holder had misused its patents, the Court of Appeals stated:

"Such an arrangement goes beyond the evils of *Line Material* because the nonpatentee machinery manufacturers are left with less incentive to patronize alternative technology as well as the reduced

---

12. *Metals Disintegrating Co.* supports Lex Tex's position. In that case, the Third Circuit held that a patent holder had purged the misuse found in his price fixing license contract when he sought the defendant's agreement to formal elimination of the illegal provisions. "Thus, but for defendant's intransigence, there would not even be colorable basis for its present contention." *Id.* at 889.

In the summary judgment order of August 23, 1978, this Court expressly rejected the Throwsters' contention that unilateral abandonment was insufficient to satisfy the first requirement of the two-prong test of purge. At pages 9–10 this Court stated:

"The rationale underlying the courts' rejection of nonenforcement as a basis for finding purge of patent misuse has no application where the patent holder affirmatively undertakes to eliminate the illegality found to constitute misuse. Therefore, a patentee's clear and unequivocal abandonment of illegal practices, even if such abandonment be unilater-

al, cannot be deemed insufficient as a matter of law to purge prior patent misuse. This is entirely consistent with the test announced in *Morton Salt, supra,* and outlined earlier." In footnote 9 on page 9 of that order, the Court dealt with the Throwsters' argument that *Westinghouse* is not applicable to the present action because the illegal royalty provisions of the license agreements benefited the manufacturers and not Lex Tex. It was evident to the Court then, as it is now, that the provisions were mutually beneficial. "In any event," the Court stated, this distinction is irrelevant for purposes of finding purge:

"the Court does not view this as a distinction sufficient to justify rejection of Lex Tex's claims of purge. The Court is concerned only with whether the practices which gave rise to the finding of patent misuse no longer are being followed. If an abandonment serving to terminate the misuse has in fact occurred, it matters not whether it resulted from mutual or unilateral action."

incentive to do so on the part of the patent holders." 541 F.2d at 1142.

The Throwsters argue that assuming Lex Tex has effectively abandoned the misuse, it must prove that all effects and consequences of the misuse are dissipated. *Morton Salt Co. v. G. S. Suppiger*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *B. B. Chemical Co. v. Ellis*, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942); *Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 279 (6th Cir.), *cert. denied*, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964). The Throwsters' position is that due to the illegal rebate arrangements between Lex Tex and the three manufacturers, the manufacturers were, and presently are, left with less incentive to patronize alternative technology.[13]

The record is clear that double heater technology dominates the apparel yarn industry. It appears that this method reached its ascendency at or about the time that the illegal agreements were entered into. Both Lex Tex and the Throwsters procured expert testimony which indicated that among the leading manufacturers, double heater machinery surpassed all other leading forms of producing apparel yarns of approximately 150 denier [14] from the late 1960's up to and including the present day. Nothing in the record indicates that this ascendency was a result of the illegal price fixing arrangements entered into by Lex Tex. Rather, it appears that the research and development of alternative technology has continued unabated from the time of the agreements to the present day.[15] Dou-

---

13. The Throwsters argue that to show full dissipation, Lex Tex must establish by a preponderance of the evidence that there is no longer a disincentive to patronize alternative technology on the part of the manufacturers, and that alternative technology has developed to the point that it would have, *but for* the illegal activities that constituted misuse. The Throwsters also contend that this alternative technology must be commercialized and "competitive" with the patented technology of Lex Tex. To prove the technology is "competitive," they contend Lex Tex must show the alternative technology is interchangeable with double heater yarn for the same end uses; is substantially equivalent in use and economy. They cite for authority the numerous cases which refer to the dissipation of *all* effects and consequences of the misuse as well as the following language of this Court:

"The determination of what is 'alternative technology' is simply a threshold question. The real issues that must be determined in the purge trial [is] whether this technology is competitive, interchangeable and equivalent, as well as questions that relate to the dissipation of the misuse found by the Court of Appeals."

*In re Yarn Processing Patent Validity Litigation*, 472 F.Supp. 170 (S.D.Fla.1979). However, an inquiry into whether technology is "competitive, interchangeable and equivalent" presupposes that there is proof that these effects and consequences actually exist. Therefore, an unpurged misuse cannot be found if there is no proof of illegal consequences in the record. *See United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1951).

14. Mr. Edwin Robbins, Vice-President of research and development for the Klopman Divi-

sion of Burlington Industries, testified that the set yarns in dispute in this case are of about 150 denier. Record at 2158.

15. For example, it was the testimony of Mr. Dufort that Scragg maintained a large research and development department. He stated that "[b]y and large it was about 10 percent of the work force of the company." Record at 1715. Dufort had stated earlier that "we are always looking for new methods of manufacturing useful yarn." *Id.* at 1702. At a later point in his testimony, Mr. Dufort was questioned about a statement made by his predecessor as Chairman of Scragg, Ernest P. R. Scragg, in the Chairman's Statement in the annual *Scragg Report & Accounts for the year ended 30th September 1970*, that "we naturally regard the many projects under development as the future lifeblood of the Company." Mr. Dufort stated: "Well the Chairman's saying, which was the truth, that research and development was the lifeblood of our company, sir."

Q. "And, despite the fact that the rest of the Chairman's report is gloomy as a result of the Klinger acquisition, what projections is there with respect to your research and development efforts?"

A. "Well, we operated on the policy, as far as we could possibly afford to do so, of never allowing the financial results of the company from year to year to infringe upon our research and development program. Because that is what we live by. That was the technology race in our industry and had been all the time I was there."

*Id.* at 1753.

In the pre-trial stipulation, Lex Tex contended "that the following, among others are 'alterna-

ble heater machines reached their position in the industry due to their economic superiority, which can in no way be linked to the existence, or effect of, the illegal paragraph (5) rebates.

The direct testimony of Mr. Dufort particularly highlights the point that the development of double heater technology was in no way related to the rebate provisions.

BY MR. ARMSTRONG:

Q. "Mr. Dufort, the Paragraph 5, Page 5 rebate provision has been said to have been used—Do you have it before you? You are familiar with it?"

A. "I am familiar with it, yes."

Q. "It has been said to be used by Lex Tex as a carrot Lex Tex held out to the three manufacturers with whom it had agreements, the result of which encouraged manufacturers to make and sell double heater machines.

Will you comment for the Court, please, on the effect of the provision on Scragg's program of making and selling double heater machinery first considering what was it that encouraged Scragg to make double heater machines?"

A. "Well, what encouraged Scragg to make double heater machines, sir, was the demand of the market for these machines. We entered the field of double heater machines rather late, later than some others and there was a demand for the machines and we decided to make them because, clearly, if we did not, we would not be competitive in the textured yarn machinery field."

Q. "Did the Paragraph 5, Page 5 rebate provision affect that decision on Scragg's part at all?"

A. "No, sir, in no way."

Record at 1781–82.

Dr. Chester Dudzik, an expert witness and former employee of Leesona Corporation in both its legal and research and development departments, also testified along similar lines. When asked about the effect of the paragraph (5) rebate on research and development at Leesona, he stated that the provision:

> "had no effect upon Leesona's developing work. It had negligible effect. As a matter of fact, the company was stimulated after they had given back, so to speak, their '912 and '724 patents to develop and devise a yarn which they felt and hoped they could manufacture machinery for and sell, in competition with set yarn machinery."

BY MR. CRABTREE:

Q. "Double heater set yarn machinery?"

A. "Yes, sir; double heater set yarn machinery."

Record at 1521.

As with the testimony of Mr. Dufort, Dr. Dudzik's testimony clearly indicates that the existence of the paragraph (5) rebate provision in the licensing agreements did not in any way stifle or dull the incentive to patronize alternative technology. On the contrary, as Dr. Dudzik stated:

> "Actually, we have since the first day of entering the texturing field continued the development of texturing methods with the expectation of finding a method which was better than that known today as the set yarn method."

Record at 1355.

The deposition of Dr. Karl Bauer, manager of Barmag's research and development since 1962, was introduced into evidence. Dr. Bauer's testimony is that the license

---

tive technology' and it is stipulated that the technology in question does not fall within the claims of the Lex Tex patents: (i) Autoclave and Crimplene processing of torque stretch yarn; (ii) Duo-twist or stop-twist processing; (iii) Stuffer-box processing (including Ban-Lon, jet or stuffer-box carpet yarn); (iv) Taslan processing; (v) Agilon processing or edge crimping; (vi) Gear crimping; (vii) Knit-de-Knit processing; (viii) Film by fibrillation processing; (ix) Acrylic machinery processing; (x) Break spinning; (xi) Bicomponent yarn processing; (xii) Draw texturing of partially oriented flat yarn on single heater-fabric twist machinery; (xiii) Friction twisting, high-spin on tic-spin processing of flat yarn on single heater-false twist machinery."

agreement with Lex Tex was "the only reason; or at least the overwhelming reason" that Barmag gave up the development of certain forms of alternative technology. Deposition of Karl H. Bauer at 270. He stated that Barmag had begun to "think in advance" of how to incorporate a second heater long before it actually developed one in the late 1960's. Then Dr. Bauer testified as follows:

BY MR. RABIN:

Q. "Doctor, in view of the fact that Barmag elected to go to the double heater system for texturing yarns in order to make yarns, I must assume an educated decision was made in evaluating the other systems that were on the market at the time, as well as some of your other research that you've mentioned?"

A. "Yes. On that occasion, of course, we observed the disadvantages which these mentioned processes or yarns produced by those processes still had."

After discussing these problems and the fact that Barmag had ceased seriously to develop those technologies, Dr. Bauer was asked:

Q. "Why did you stop it?"

A. "Because we had a chance to sell double heater machines world wide."

*Id.* at 285–87.

Dr. Bauer later stated in response to another question from Mr. Rabin:

"After Barmag entered into the Lex Tex agreement, for myself this meant that I was told by the patent department that we were allowed to sell double heater machines in the United States.

Barmag stopped its efforts to look for other means for producing polyester set yarns. By this we saved money and effort, and had no incentive to actively develop another type of machine which would be used for yarn types with properties of those polyester set yarns which were produced on double heater false twisting machines."

Record at 297–98.

In the context of all the evidence introduced in this case, it is evident that Dr. Bauer's remarks reflect both the fact that double heater machines are economically superior to any comparable machines previously developed or that are presently under development, and that in light of that superiority, Barmag was relieved that it could develop and market double heater machines in the United States free from infringement under the Lex Tex patents as a party to this agreement. Dr. Bauer's testimony does not indicate that the illegal rebate provision or any effect stemming from it caused Barmag to lose its incentive to patronize alternative technology. In fact, Dr. Bauer later testified that Barmag is still undertaking:

"a continuous effort . . . to make our existing machines cheaper. This is true for all types of false twisting machines which we are making today, as well as the STM 16 machine or air-texturing machine. This is natural."

*Id.* at 314.

Reviewing all the testimony in this case, the Court concludes that none of the manufacturers has been able to find a way to produce apparel yarns which is cheaper and more effective than the double heater texturing method.[16]

16. Mr. Dufort stated on direct examination: "Now, if anyone during the whole of that period could have come up and heaven knows, everybody tried to in the industry, could come up with anything which would have been better or cheaper or both, than the double heater machines, then he would have had at his feet a tremendous world-wide market.

I'm not saying that a small improvement would have been enough. But the potential is so enormous in this huge market that any of us in the machinery manufacturing industry would have given our eyeteeth for a better replacement, particularly if we could have had it to ourselves.

But nobody ever succeeded in finding one; neither the machine makers nor the textile industry nor the enormous chemical fiber industry, which produces raw materials."
Record at 1807.

None of the cases cited by the Throwsters holds that an unpurged misuse can be found when the factual record before the trial court shows no effects to be dissipated. The Court of Appeals could not have made a factual finding of such effects "on this scanty summary judgment record that does not even educate us to the existence of alternative technologies." 541 F.2d at 1135. Rather, the Court of Appeals made no factual findings of any kind based on the record in this Court.[17]

As the court stated in *Ansul Co. v. Uniroyal, Inc.,* 306 F.Supp. 541, 560 (S.D.N. Y.1960), *aff'd & mod.* 448 F.2d 872 (2d Cir.), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1971):

> "What conduct constitutes a 'purge' depends upon the nature and extent of the misuse. Where the misuse consists of the insertion of an objectionable provision in

a contract, the patentee's cancellation and abandonment of the clause may be sufficient."

Unlike the misuse found in *Ansul,* it is clear that the price fixing clause in the Lex Tex license agreements did not have "a pronounced impact on restraining competition," or the development of, incentive to patronize, or the ability to market alternative technology.

A case of some relevance to this decision is *Whitecap Co. v. Owens-Illinois Glass Co.,* 203 F.2d 694 (6th Cir.), *cert. denied,* 346 U.S. 876, 74 S.Ct. 128, 98 L.Ed. 384 (1953). *Whitecap* involved a suit by a patentee on the infringement of "a closure cap and package." The district court referred the case to a master who found that although plaintiff's practices with reference to the licensing of machines and the leasing there-

---

**17.** Aside from the fact that the agreements fixed prices at a higher level. This effect was dissipated on or before the date of effective abandonment by Lex Tex. The language in the Fifth Circuit opinion that refers to alternative technology is a conclusion of law not a finding of fact. The Court of Appeals made certain presumptions based on its finding of price fixing. The court made no factual finding that after the abandonment of the illegal agreements an undissipated effect was the disincentive to patronize alternative technology. Consistent with this presumption and the general rule placing the burden on the patentee to show dissipation of the illegal effects and consequences, this Court placed the burden on Lex Tex to rebut the presumption that the incentive to patronize alternative technology was stifled.

This Court's interpretation of the "incentive to patronize" language in the Court of Appeals opinion is bolstered by the phrase, "as well as reduced incentive to do so on the part of the patent holders." As the record in this case indicates, Lex Tex was created in 1967 and assigned the '724 and '912 patents as a result of a dispute between their former owners, Leesona Corporation, and Permatwist over the proper exploitation of these double heater patents. Leesona and Permatwist agreed to turn the patents over to Permatwist's nominee. Therefore, it is unlikely that Lex Tex as the nominee of Permatwist, functioning in its sole capacity as patent holder, could have any inclination or incentive to patronize alternative technology.

Even if it were found that the agreements entered into by Lex Tex with the three machinery manufacturers did have the effect of discouraging the patronization of alternative technology before abandonment, the record would

support a finding that the effects were dissipated at the time of Lex Tex's effective repudiation.

The Throwsters have argued that certain misuse effects cannot be dissipated. They contend that a major effect that can never be purged is that the Throwsters cannot afford to "scrap" this double heater machinery in favor of alternative technology. Such an argument misreads the Fifth Circuit's opinion.

The Court of Appeals stated that it was the incentive on the part of the *machinery manufacturers, not the Throwsters,* to patronize alternative technology that was a presumption that underlies its finding of price fixing. The Throwsters were in no way bound to buy machines from Leesona, Barmag or Scragg. There were at least 50 machinery manufacturers operating at any one time in the industry, including both ARCT and Heberlein, both large manufacturers. Record at 1361–62.

This case is therefore distinguishable from *Kearney & Trecker Corporation v. Cincinnati Milacron, Inc.,* 562 F.2d 365 (6th Cir. 1977), cited by the Throwsters. In that case, the Sixth Circuit held that Kearney & Trecker's efforts at purge were ineffective since the misuse involved "deceptive intention." The court distinguished between misuse of a patent acquired without wrongdoing and misuse of a patent procured by fraud on the Patent Office. In the latter case, no dissipation could be found in *Kearney & Trecker* by disclaiming of the reissue claims pursuant to 35 U.S.C. § 253. *Id.* at 371–72. No such situation is before this Court in MDL 82.

of violated Section 3 of the Clayton Act, 15 U.S.C. § 14, the plaintiff had purged his misuse. The district court confirmed the report and entered judgment dismissing the complaint. On appeal, the Sixth Circuit affirmed the master's finding of purge.

That court rejected the defendant's argument that the plaintiff had not shown dissipation of the consequences of the misuse.

> "There is no evidence that any lessee was ever affected in his choice of caps by the indemnification clause. Under such circumstances it was unnecessary for the plaintiff to prove that the consequences of the misuse have been dissipated because it was not shown that the misuse had illegal [effects]." *Id.* at 698.

*See, also United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); *Printing Plate Supply Co. v. Crescent Engraving Co.*, 246 F.Supp. 654, 673–74 (W.D.Mich.1965).

Viewing the record before this Court, there has been no evidence introduced to show that the paragraph (5) arrangement had any effect whatever on the incentive to patronize alternative technology by the three machinery manufacturers. Lex Tex has presented a strong case to the contrary. The Court therefore finds an effective purge as of May 31, 1977, the date the misuse was abandoned.

An order scheduling a preliminary pretrial conference will be entered forthwith. A trial date on the remaining issues will be fixed at that time.